**UNITED STATES of America,**
**Appellee,**

v.

**Bebe Fazia LALJIE, Defendant–**
**Appellant.**

**Docket No. 98–1295.**

United States Court of Appeals,
Second Circuit.

Argued April 19, 1999.

Decided July 14, 1999.

David C. Finn, Assistant United States Attorney, New York, New York (Mary Jo White, United States Attorney for the Southern District of New York, Christine H. Chung, Assistant United States Attor-ney, New York, New York, on the brief), for Appellee.

Abraham Hecht, Forest Hills, New York, for Defendant–Appellant.

Before: KEARSE, McLAUGHLIN, and CALABRESI, Circuit Judges.

KEARSE, Circuit Judge:

Defendant Bebe Fazia Laljie appeals from an amended judgment entered in the United States District Court for the Southern District of New York following a jury trial before Sonia Sotomayor, *Judge*, convicting her on 33 counts of mail fraud, in violation of 18 U.S.C. § 1341 (1994), and 14 counts of bank fraud, in violation of 18 U.S.C. § 1344 (1994). Laljie was sentenced principally to 57 months' imprisonment, to be followed by a five-year term of supervised release, and was ordered to pay restitution in the amount of $550,654.16. On appeal, she challenges the sufficiency of the evidence to support her convictions, the conduct of the trial, and the calculation of her sentence. We find merit only in the challenge to two counts of bank fraud.

## I. BACKGROUND

The present prosecution arises out of Laljie's employment as the personal executive secretary of Richard J. Schmeelk. After Laljie left Schmeelk's employ, her successor noticed in one of Schmeelk's checking accounts a sizeable discrepancy between the balance reported by the bank and the balance shown in the handwritten check register that had been maintained by Laljie. Schmeelk initiated an investigation which revealed, *inter alia*, that numerous checks that he had signed in order to pay his and his family's expenses had been diverted by Laljie to her own use.

Laljie was indicted on 61 counts of mail fraud and 14 counts of bank fraud, each count relating to a different check. The government's proof at trial was presented principally through documentary evidence, the testimony of Schmeelk, and the testi-

mony of others who preceded or succeeded Laljie as Schmeelk's personal executive secretary. Taken in the light most favorable to the government, the evidence revealed the following.

## A. *The Events*

### 1. *The Duties of Schmeelk's Personal Executive Secretary*

Schmeelk, 73 years of age at the time of trial in 1997, was a former general partner of a major investment banking firm at which he had worked for more than 40 years. After retiring from that firm, he became cofounder and chairman of a merchant banking business. At trial, Schmeelk described the responsibilities of one serving as his personal executive secretary as they applied to Laljie, her successor, her predecessor, and her predecessor's predecessor. Both the predecessor and the successor to Laljie in that position also testified. The responsibilities of the position, to the extent pertinent to this prosecution, were essentially the same throughout a nearly 25–year period.

The duties of Schmeelk's personal executive secretary included managing his personal checking account (the "Schmeelk account") for the payment of his and his family's personal bills. Some of those bills were sent directly to Schmeelk's office; others, received at his home, were brought by Schmeelk to his office and given to his secretary for processing. The secretary was to prepare checks drawing on the Schmeelk account, attach the checks to the bills to which they related, and place the checks and bills in a folder. After a stack of bills had accumulated, she was to present the folder to Schmeelk. Schmeelk testified that he would generally "glance at" the bills before signing the corresponding checks (Trial Transcript ("Tr.") 142); Laljie's successor testified that Schmeelk would often sign the checks without looking at the bills. Laljie's predecessor testified that she normally presented him with several dozen checks at a time. During the course of a month, Schmeelk would sign approximately 75 to 100 checks in this manner.

From time to time, Schmeelk would also ask his secretary to obtain specified amounts of cash for him. Until mid–1995, the procedure was for the secretary to telephone his bank and ask to have that sum delivered. Thereafter, Schmeelk placed his personal account with a different bank and made arrangements with a convenient branch of that bank for his secretary simply to cash his checks made payable to "Cash." Using either procedure, the secretary would give Schmeelk an envelope containing the amount of cash he had specified. Schmeelk rarely counted the money handed to him in those envelopes.

In addition, Schmeelk would periodically entrust to the secretary several checks that he had signed but had left blank as to both amount and payee. They were to be used if a payment such as one for estimated income tax came due, or a family emergency occurred, at a time when Schmeelk was not available. In such an event, the secretary was to fill in the amount and the payee, make the payment, and record the information in the check register. Such presigned checks were used by Schmeelk's secretary approximately six times a year. Laljie's predecessor once attempted to show Schmeelk how such a check had been used, but he informed her that that was not necessary. Schmeelk generally did not inquire as to whether or how the presigned checks had been used.

In addition to preparing checks drawn on the Schmeelk account, Schmeelk's secretary was also responsible for accurately maintaining the check register and reconciling register entries with cancelled checks and the monthly balance reports prepared by Schmeelk's bank. Neither Schmeelk, nor his wife, nor his accountant normally reviewed those registers, checks, or reports.

## 2. Use of Schmeelk's Checks To Pay Laljie's Credit Card Bills

Laljie was employed as Schmeelk's personal executive secretary from November 1993 through June 1996, and her responsibilities included those described above. With respect to that period, the government presented evidence of, *inter alia*, 56 cancelled checks drawn on the Schmeelk account, each of which had been made payable to the issuer of a credit card for the account of Laljie or her husband. The majority were made payable to American Express, frequently in amounts that exactly matched the balances on American Express bills sent to Schmeelk and his wife. However, on the memo line of the checks, Laljie inserted the account number of herself or her husband, and Schmeelk's checks were mailed to American Express as payment on the Laljies' accounts. The amounts of those checks usually exceeded the amounts due on the Laljies' accounts, and the Laljies thereby accumulated significant credits in their accounts.

The remaining checks had been mailed to banks in Delaware (Advanta Corporation and CoreStates Bank), Atlanta, Georgia (Prudential Bank & Trust), and Uniondale, New York (First Bank Services). All of those banks were institutions at which the Schmeelks did not maintain credit card accounts but the Laljies did. Notwithstanding the fact that most of these checks were sent to Prudential Bank & Trust, First Bank Services, and Advanta, Laljie recorded them in the Schmeelk account's check register as payments to "Chemical Visa," an account of Mrs. Schmeelk. Similarly, one check to Prudential Bank & Trust making payment on Laljie's credit card account was recorded as having been paid to "Citibank Visa," a Schmeelk account; and a check making payment on Laljie's CoreStates account was recorded as a payment to "Visa Gold," another account of Mrs. Schmeelk.

Schmeelk testified that he never gave Laljie authority to use his funds to pay any of her credit card accounts.

## 3. The Altered Checks Payable to "Cash"

Laljie also, like her predecessors, had responsibility for obtaining cash for Schmeelk in amounts he specified. In 1995, Schmeelk's personal account was placed with a bank that had a branch in the lobby of the building in which Schmeelk's office was located. Schmeelk gave that branch a letter with respect to that account, indicating that Laljie was authorized to endorse and cash his checks made payable to "Cash." The government introduced 12 cancelled checks, the earliest dated September 14, 1995, drawn on the Schmeelk account, signed by Schmeelk, and made payable to "Cash" (the "Cash checks"). On each such check, the amount had been altered.

A forensic document examiner testified that each of the Cash checks had been typed and had then been "put back in a typewriter and carefully aligned"; the typist had used correction tape to lift certain characters from the face of the checks and had then typed in their place different characters. (Tr. 484.) For example, on one Cash check a "1" had been replaced with a "2," and the word "one" replaced with "two," so that a check originally for $1,000 became a check for $2,000. (Tr. 471.) Similarly, the original $2,000 amount of another Cash check had been changed to $4,000.

Schmeelk testified that when he asked Laljie to write a Cash check, he never asked or authorized her to increase the amount above that originally requested.

## 4. The Checks Made Payable to "New Sights, Inc."

The government also introduced two cancelled checks in amounts totaling more than $55,000, drawn on the Schmeelk account and signed by Schmeelk, that had been made payable to "New Sights, Inc." ("New Sights"). The name "New Sights," however, did not appear in any check reg-

ister entry. On the memo lines of the New Sights checks, Laljie had written the name "Avanti," a real estate investment company partly owned by Schmeelk; and in each of the check register entries corresponding to the two New Sights checks, Laljie had written the Avanti name and the name of one of that group's real estate properties. Neither Avanti nor Avanti's properties received either the New Sights checks or any benefit from them. New Sights, the payee, which cashed the checks, was a real estate company owned by Laljie's husband.

Schmeelk testified that he was not aware of having signed checks made payable to New Sights and that he never authorized payments to New Sights.

## B. *Laljie's Statements to the Private Investigators*

Schmeelk terminated Laljie's employment as his personal executive secretary in mid–1996, citing various deficiencies in her work. Some months later, Laljie's successor discovered some of the discrepancies in the Schmeelk account. After a thorough investigation revealed diversions totaling more than $800,000, Schmeelk brought a civil action against Laljie in state court; his attorneys hired licensed private investigator Dennis Dwyer, a former United States Secret Service agent, to determine the extent of Laljie's assets and to ascertain what had become of the embezzled funds. At the trial in the present case, Dwyer testified that in December 1996 he and a colleague, Edward Engel, went to Laljie's home to serve her with, *inter alia,* a state-court restraining order, freezing her assets, and to conduct an interview.

Dwyer testified that Laljie invited them into her home and spoke with them for nearly two hours. Dwyer told Laljie that they "wanted to talk to her about the fact that $800,000 of Mr. Schmeelk's personal checks had been fraudulently used to pay her American Express and Visa accounts" (Tr. 361–62), and they showed her copies of certain of those checks. Dwyer testified

that Laljie initially replied that she had "never signed [Schmeelk's] name on any of the checks" (Tr. 364); that when Dwyer informed her that she was suspected not of forging the signatures but of misdirecting Schmeelk's checks to her own creditors, "she acknowledged that she had in fact used those checks without Mr. Schmeelk's permission to pay her own credit card accounts" (*id.*); and that Laljie said she had considered herself underpaid as Schmeelk's secretary, especially given Schmeelk's wealth, and had felt she deserved extra compensation.

According to Dwyer, Laljie described the three methods by which she had embezzled funds from the Schmeelk account, to wit, the payments on the Laljies' credit card accounts, the payments to New Sights, and the alteration of the Cash checks, and said she had found the process "very easy" (Tr. 371):

> She said when she first started, she would insert one of her invoices from American Express with a check that she had prepared into this stack of correspondence, that Mr. Schmeelk would sign without looking at it, and that he would just go ahead and sign it . . . she said she started with small amounts and that it just kept on growing. When she began, she just couldn't stop.

(*Id.*) Dwyer testified that he took contemporaneous notes of his conversation with Laljie. Those notes included the notation "cash checks to bank downstairs, 1–2, 2–4," which Dwyer explained was his shorthand description of Laljie's explanation that, before Cash checks signed by Schmeelk were presented to the bank branch in the lobby of the building, "the amounts were altered from 1,000 to 2,000 or 2,000 to 4,000." (Tr. 428 (internal quotation marks omitted).)

Dwyer testified that Laljie told him she wanted to make restitution to Schmeelk but she had already spent the embezzled funds on extensive home renovations, jewelry, a first-class vacation with her hus-

band in Aruba, and various other luxury items.

### C. *The Present Prosecution*

In the present case, a 75–count superseding indictment against Laljie charged her with 61 counts of mail fraud in violation of § 1341 in connection with the checks sent to pay the Laljies' credit card bills (counts 1–61); two counts of bank fraud in violation of § 1344 in connection with the New Sights checks (counts 62 and 63); and 12 counts of bank fraud in violation of § 1344 in connection with the Cash checks (counts 64–75). Counts 34, 41, 43, 49, and 58 were voluntarily dismissed by the government before trial. The government's trial evidence on the remaining 70 counts included that described above.

Laljie testified in her own defense at trial. While conceding that she had in fact used most of the checks in question to fund her own personal expenditures, she defended her conduct principally by stating that she had been authorized to do so by Schmeelk. She testified that Schmeelk had authorized her use of checks drawn on his personal account and had given her cash because he and she were having an affair. According to Laljie, an intimate physical relationship between herself and Schmeelk had begun in January 1994, shortly after Laljie confided in Schmeelk that she was having problems with her husband, and Schmeelk in turn confided in her that he was having "sexual problems with his wife" (Tr. 559). Laljie testified that Schmeelk later disclosed also that he suffered to some extent from erectile dysfunction and required injections in order to perform sexually. *See* Part II.C. below.

Laljie testified that during the early stages of the affair, Schmeelk indicated that he "wanted to help [Laljie] with [her] financial situation at home." (Tr. 561.) In order to conceal their relationship, however, Schmeelk instructed Laljie to "make purchases in the amount close to or the same amount as Ms. [*sic*] Schmeelk's" (Tr. 561–62), to write checks on the Schmeelk account to pay Laljie's bills, and to record the payments in the check register "as if [she] were paying Mrs. Schmeelk's bills" (Tr. 561). In that way, "in case one would look at the books, they would think it was Ms. [*sic*] Schmeelk's card and not [Laljie's]" that had been paid. (Tr. 562.)

Laljie also acknowledged having changed the amounts due on numerous Cash checks; but she testified that she did so because Schmeelk frequently changed his mind after a check had been typed. She testified that he would sometimes decide that he needed more money, or he would sometimes decide to take out additional money in order to give cash to Laljie. Rather than retype an entire check, Laljie testified, she would change the amount on the check she had already prepared. After cashing the checks, she always gave the entire amount of cash received to Schmeelk.

As to the New Sights checks, Laljie testified that when their sexual relationship was coming to an end Schmeelk indicated that he wanted to make sure that Laljie was "taken care of" and that he therefore offered to give financial assistance to her husband's company. (Tr. 582.) Laljie testified that Schmeelk instructed her to enter the Avanti name on the memo lines of the checks, implying that the source of the investment was his investment group, because her husband did not know that Schmeelk and Laljie had an intimate relationship.

As to the statements attributed to her by Dwyer, Laljie denied having admitted any wrongdoing and testified that she had felt intimidated and threatened during the course of that interview. She also called Engel as a witness in an effort to dispute the accuracy of Dwyer's account. Engel testified that neither he nor Dwyer had tape-recorded the conversation with Laljie, though Engel had had extensive experience in surreptitious audiotaping by using a pocket recorder. Nor had they attempted to obtain a written statement from Lal-

jie, though Engel had had extensive experience in the taking of such statements. Engel acknowledged that he was aware that either a tape recording or a written statement would make testimony as to a declarant's admissions less vulnerable to a credibility challenge.

On the 70 counts submitted to it, the jury found Laljie not guilty on counts 1–23, which charged mail frauds prior to September 14, 1995 (the date of the first altered Cash check); it found her guilty on the remaining mail fraud counts, to wit, counts 24–33, 35–40, 42, 44–48, 50–57, and 59–61, all of which charged mail frauds after that date; and it found her guilty on all 14 counts of bank fraud (counts 62–75). Following proceedings discussed in greater detail in Part II.D. below, Laljie was sentenced principally to 57 months' imprisonment, to be followed by a five-year term of supervised release; she was eventually ordered to pay restitution in the amount of $550,654.16, the amount of loss associated with the counts of conviction.

This appeal followed.

## II. DISCUSSION

Laljie contends that she is entitled to dismissal of the indictment on the grounds (a) that there was insufficient evidence that she used the mails in furtherance of her frauds, and (b) that neither the Cash checks nor the New Sights checks exposed a bank to actual or potential loss. She contends alternatively that she is entitled to a new trial because the district court improperly limited her cross-examination of Schmeelk and because the court evinced bias against her. Laljie also contends that the district court erred in calculating her sentence. For the reasons that follow, we find merit only in her challenge to the bank fraud convictions based on the New Sights checks.

### A. *Mail Fraud*

■ Laljie contends that the evidence of mail fraud was legally insufficient to support her convictions for those offenses because, she argues, each "fraud had already occurred once [she] had placed her account number on the check and took the check into her possession," and "[s]ince the fraud occurred prior to making the mailing, the mailing was not in furtherance" of her fraudulent scheme. (Laljie brief on appeal at 29.) This contention has no foundation, legal or factual.

■ In order to convict a defendant of mail fraud in violation of 18 U.S.C. § 1341, the government must show that the defendant engaged in a scheme to defraud her victim of money or property, and that that scheme was furthered by use of the mails. *See, e.g., United States v. Tocco,* 135 F.3d 116, 124 (2d Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 1581, 140 L.Ed.2d 795 (1998); *United States v. Altman,* 48 F.3d 96, 101 (2d Cir.1995). To satisfy the use-of-the-mails element of the offense, the government need show only that a mailing caused by the defendant was " 'incident to an essential part of the scheme.' " *United States v. Bortnovsky,* 879 F.2d 30, 36 (2d Cir.1989) (quoting *Pereira v. United States,* 347 U.S. 1, 8, 74 S.Ct. 358, 98 L.Ed. 435 (1954)). "There is no requirement that the mailings precede the fraud." *United States v. Slevin,* 106 F.3d 1086, 1089 (2d Cir.1996); *see United States v. Bortnovsky,* 879 F.2d at 37 (mailing two years after filing of false claim sufficient to support mail fraud conviction). Accordingly, the fact that the mailings occurred after Laljie fraudulently placed her own account numbers on the checks provides no basis for reversal.

■ Further, we reject Laljie's view that her fraudulent conduct with respect to a given check was complete the moment she had the signed check with her account number on it in her possession. We agree that her placement of her account number on the check constituted fraudulent conduct; but her frauds were not yet complete because the checks were not made payable to Laljie herself but rather were made payable to her creditors. Before the

checks were delivered to Laljie's creditors, Schmeelk had not been deprived of his funds, and Laljie had gained nothing except possession of checks that she herself could not cash. Thus, the evidence showing that Laljie mailed the checks drawn on the Schmeelk account to her creditors, thereby causing those institutions to credit the Laljies' accounts with those payments, was ample to establish use of the mails in furtherance of Laljie's fraudulent scheme.

## B. *Bank Fraud*

The bank fraud statute under which Laljie was prosecuted imposes criminal penalties on one who

> knowingly executes, or attempts to execute, a scheme or artifice—
>
> (1) to defraud a financial institution; or
>
> (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises....

18 U.S.C. § 1344. The purpose of this section is to protect the federal government's interest as an insurer of financial institutions. *See, e.g., United States v. Rodriguez,* 140 F.3d 163, 168 (2d Cir.1998); *United States v. Stavroulakis,* 952 F.2d 686, 694 (2d Cir.), *cert. denied,* 504 U.S. 926, 112 S.Ct. 1982, 118 L.Ed.2d 580 (1992). Accordingly, although a bank need not be the immediate victim of the fraud, the government is required to prove that a bank was an actual or intended victim, *see, e.g., United States v. Barrett,* 178 F.3d 643, 646–48 (2d Cir.1999), *i.e.,* that the defendant "engage[d] in or attempt[ed] to engage in a pattern or course of conduct designed to deceive a federally chartered or insured financial institution into releasing property, with the intent to victimize the institution by exposing it to actual or potential loss," *United States v. Stavroulakis,* 952 F.2d at 694; *see United States v. Rodriguez,* 140 F.3d at 167–68.

Presentation to a financial institution of a fraudulent document that exposes the institution itself to a potential loss if the document be honored and funds be released, such as a forged or altered document, is within the scope of § 1344. *See, e.g., United States v. Barrett,* 178 F.3d 643, 647–49; *United States v. Jacobs,* 117 F.3d 82, 92–94 (2d Cir.1997); *United States v. Stavroulakis,* 952 F.2d at 695. Further, actual or potential loss to the financial institution need not be proven, so long as there is evidence that the defendant intended to expose the institution to such loss, such as by presentation of forgeries. In *United States v. Barrett,* we noted that even if a bank might not be civilly liable, § 1344 is applicable where the defendant "intended to defraud the bank by passing forged checks" and, after obtaining checks from his employer, "[a]n essential step in [his] fraudulent scheme was his act of forging endorsements on the checks." 178 F.3d at 647–48; *see also id.* n. 3 ("banks face practical adverse consequences and potential liability problems when they cash checks over forged endorsements"). We have also held that § 1344 encompasses a scheme to sell stolen checks that are entirely blank, for

> a forged signature of the drawer necessarily has to be affixed to a stolen, blank check. Inherent in a sale of stolen checks is that they will eventually be presented to the drawee bank for payment; and payment over a forged signature exposes the bank to real loss. In most forgery situations, the bank will be legally liable, and ... even in a number of those situations where the bank is not legally liable for paying over a forged signature, the bank will often swallow the loss for the customer.

*United States v. Stavroulakis,* 952 F.2d at 695.

Because § 1344 focuses on the bank, rather than on other potential victims, a conviction under § 1344 is not supportable by evidence merely that some person other than a federally insured fi-

nancial institution was defrauded in a way that happened to involve banking, without evidence that such an institution was an intended victim. *See, e.g., United States v. Blackmon,* 839 F.2d 900, 906 (2d Cir.1988) ("Where the victim is not a bank and the fraud does not threaten the financial integrity of a federally controlled or insured bank, there seems no basis in the legislative history for finding coverage under [§ 1344]."). Thus, neither "a scheme to pass bad checks," *United States v. Jacobs,* 117 F.3d at 92–93, nor a "pigeon drop" scheme, in which the victim is induced to withdraw money from a bank and entrust it to the defendant, *United States v. Blackmon,* 839 F.2d at 902 (internal quotation marks omitted), constitutes bank fraud under § 1344. In such situations, the bank, though made an unwitting instrumentality of the fraud, is not deemed its victim.

■■■ Nor does it suffice under § 1344 for the government to show simply that the defendant has deposited in her account a check that she has fraudulently caused her victim to make payable to her. In *United States v. Rodriguez,* which was decided **shortly** after the jury had returned its verdicts in the present case, we found such evidence insufficient to support a bank fraud conviction for two reasons. First, we noted that generally "[a] course of conduct consisting of simply depositing checks into a bank account where the depositor knows that he/she is not entitled to the funds does not alone constitute false or fraudulent pretenses or representations" within the meaning of § 1344, because " 'technically speaking, a check is not a factual assertion at all, and therefore cannot be characterized as "true" or "false." ' " *United States v. Rodriguez,* 140 F.3d at 168 (quoting *Williams v. United States,* 458 U.S. 279, 284, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982)). Second, we noted that "where a bank takes a check as a holder in due course, under most circumstances the bank cannot be victimized," and in such a situation the bank fraud statute is not violated. *United States v.*

*Rodriguez,* 140 F.3d at 168 (footnote omitted); *see also United States v. Davis,* 989 F.2d 244, 247 (7th Cir.1993); U.C.C. § 3–302(a) (a bank is a holder in due course of a check where that check "does not bear such apparent evidence of forgery or alteration or is not otherwise so irregular or incomplete as to call into question its authenticity," and where the bank took the check for value, in good faith, and without notice of its defects). In sum, we ruled in *Rodriguez* that where there are "no other facts evincing an intent to victimize the financial institution," the deposit of facially proper checks, which had no alterations and bore the authentic signature of a person who had authority to sign, and which the bank received as a holder in due course, did not become bank fraud within the meaning of § 1344 merely by reason of the defendant payee's procurement of the check from its maker by means of fraud. 140 F.3d at 165; *see also United States v. Barrett,* 178 F.3d 643, 647 (distinguishing *Rodriguez* on the basis that the *Rodriguez* panel "noted that defendant in that case did not present forged or stolen checks for deposit and thus did not intend to victimize the bank").

■■■ Applying these principles to the present case, we conclude that the government established bank frauds with regard to the Cash checks, but not with respect to the New Sights checks. Each of the 12 Cash checks had been physically altered as to the amount to be withdrawn, their dollar amounts being increased after Schmeelk signed the checks. Laljie admitted having made those physical alterations; and Schmeelk testified that each was made without his authorization. The evidence showed that the alterations, upon scrutiny, were apparent to the naked eye, and hence permitted the inference that they were sufficiently visible to call into question the checks' authenticity, putting the bank on notice that the maker might have a defense against it and preventing the bank from enjoying the status of holder in due course.

Consequently, Laljie's conduct with respect to the Cash checks was not tantamount to simply depositing fraudulently procured checks in her account. Rather, her presentation of the Cash checks constituted a false representation to the bank that Schmeelk, the maker, had made each check payable in the amount eventually shown on its face. Since the Cash checks had been visibly altered, the bank itself was exposed to potential losses, and the jury was entitled to infer that, with respect to those checks, Laljie had "knowingly execute[d] a scheme ... to defraud a financial institution" within the meaning of § 1344.

The checks made payable to New Sights, the subjects of counts 62 and 63 of the indictment, stand on a different footing. First, there was no evidence that the amounts shown on the face of those checks had been altered, or that Schmeelk's signature on those checks was not genuine, or that the name of any entity other than New Sights had originally been entered as payee. Accordingly, the government did not establish with respect to those checks that the bank was in any way at risk of loss.

Further, there was no evidence that those checks were intended to victimize the bank. The government theorizes that the New Sights checks were two of the presigned blank checks entrusted to Laljie for use when Schmeelk was unavailable; and it argues that Laljie "fraudulently altered the blank checks so that they were made payable to New Sights," and that "Laljie's misrepresentation was meant to *deceive the bank into believing that New Sights was a legitimate payee,* and to release the funds under its custody and control on that basis." (Government brief on appeal at 29 (emphasis added).) This argument is untenable in light of *Rodriguez* and established commercial principles. The Uniform Commercial Code gives the following example:

> *Case # 4.* Employer, who owed money to X, signed a blank check and delivered it to Secretary with instructions to complete the check by typing in X's name and the amount owed to X. Secretary fraudulently completed the check by typing in the name of Y, a creditor to whom Secretary owed money. Secretary then delivered the check to Y in payment of Secretary's debt. Y obtained payment of the check.... Since Secretary was authorized to complete the check, Employer is bound by Secretary's act in making the check payable to Y. The drawee bank properly paid the check.

U.C.C. § 3–302, Official Comment 4.

■ A bank is responsible for noticing apparent alterations and forgeries and for knowing, *e.g.,* how many signatures are required and what signatures are authorized with respect to a given account. But the government has called to our attention no principle of statutory law, common law, or business practice that makes a bank responsible for knowing to what entities the owner of the account might make payments. The insertion of a name on a payee line that has been left blank by the maker of the check may defraud the maker; but it does not, of itself, evince an intent to defraud the bank and hence does not constitute bank fraud within the meaning of § 1344.

We therefore reverse Laljie's convictions for bank fraud on counts 62 and 63.

**C.** *Laljie's Challenges to the Conduct of the Trial*

■ With regard to the conduct of the trial, Laljie complains principally that the district court improperly refused to allow her to cross-examine Schmeelk with respect to his erectile dysfunction condition. She also contends that in the presence of the jury the trial judge made a comment demeaning her attorney, and that outside the jury's presence the judge posed a question to the government that led the government to present clarifying evidence. The latter contentions do not

warrant discussion, as the record does not support the suggestion that the court's comment or question deprived Laljie of a fair trial. *See generally United States v. Manko,* 979 F.2d 900, 905–07 (2d Cir.1992), *cert. denied,* 509 U.S. 903, 113 S.Ct. 2993, 125 L.Ed.2d 687 (1993); *United States v. Pisani,* 773 F.2d 397, 402 (2d Cir.1985). We discuss below only the contention that cross-examination was improperly curtailed.

Prior to trial, the government, which was aware of the nature of Laljie's defense, moved *in limine* to preclude Laljie from cross-examining Schmeelk on the subject of his erectile dysfunction condition and treatment for that condition. The motion stated that the government did not seek to preclude questions as to the alleged affair; but it argued that questions as to Schmeelk's condition and treatment would be irrelevant and unfairly prejudicial, serving only to harass and embarrass Schmeelk and to distract the jury.

Laljie opposed the motion, stating that she anticipated that Schmeelk would claim an inability to have an affair with her because he was impotent, and that it was "imperative that Defendant have an opportunity to fully cross-examine the witness about their relationship and whether or not such a relationship could, and did indeed, take place." (Laljie letter to the court dated September 30, 1997, at 2.) The government responded that it had no intention of eliciting testimony from Schmeelk that his condition foreclosed an affair with Laljie, and that there was therefore no need for cross-examination into that condition.

In light of the government's response, the district court granted its *in limine* motion barring questions about Schmeelk's medical condition. However, the court informed Laljie that she was free to question Schmeelk as much as she wished about the alleged affair. (Pretrial Transcript October 6, 1997 ("Pr.Tr."), 30 ("delve into that all you want").) On appeal, Laljie contends that the prohibition against questioning Schmeelk about his condition violated her rights under the Confrontation Clause. We disagree.

 The Confrontation Clause guarantees the defendant in a criminal case the right to cross-examine the witnesses against her. *See, e.g., Delaware v. Van Arsdall,* 475 U.S. 673, 678, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *Davis v. Alaska,* 415 U.S. 308, 315–16, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). Nonetheless, the right is not illimitable:

> [T]rial judges retain wide latitude ... to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.

*Delaware v. Van Arsdall,* 475 U.S. at 679, 106 S.Ct. 1431; *see also United States v. Sasso,* 59 F.3d 341, 347 (2d Cir.1995); *United States v. Scotti,* 47 F.3d 1237, 1248 (2d Cir.1995). "Cross-examination is not improperly curtailed if the jury is in possession of facts sufficient to make a 'discriminating appraisal' of the particular witness's credibility." *United States v. Roldan–Zapata,* 916 F.2d 795, 806 (2d Cir. 1990), *cert. denied,* 499 U.S. 940, 111 S.Ct. 1397, 113 L.Ed.2d 453 (1991); *see United States v. Sasso,* 59 F.3d at 347; *United States v. Singh,* 628 F.2d 758, 763 (2d Cir.), *cert. denied,* 449 U.S. 1034, 101 S.Ct. 609, 66 L.Ed.2d 496 (1980). What the Clause guarantees is "not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish," but rather "an *opportunity* for effective cross-examination." *Delaware v. Van Arsdall,* 475 U.S. at 679, 106 S.Ct. 1431 (emphasis in original) (internal quotation marks omitted). The trial judge's decision to limit cross-examination will not be overturned absent an abuse of discretion. *See, e.g., United States v. Beverly,* 5 F.3d 633, 638 (2d Cir.1993); *United States v. Maldonado–Rivera,* 922 F.2d 934, 956

(2d Cir.1990), *cert. denied,* 501 U.S. 1233, 111 S.Ct. 2858 (1991).

We see no abuse of discretion in the present case. Laljie had ample opportunity to present her defense that Schmeelk had authorized her personal use of his funds because the two were having an affair. First, Laljie herself was not prevented from testifying that she and Schmeelk had had an affair; indeed she so testified in what the district court later described as "salacious detail" (Sentencing Transcript, May 18, 1998 ("S.Tr."), 15).

Second, Laljie was not prohibited from cross-examining Schmeelk about the alleged affair. Her attorney chose to ask Schmeelk only one direct question on that subject:

Q. Did you ever have an ongoing relationship with Ms. Laljie?

A. Absolutely not.

Q. Did you ever work late when Ms. Laljie was in the office?

A. Not to my knowledge. She was pretty prompt coming in, getting out around 5 o'clock.

Q. Did you confide in Ms. Laljie as to any problems you had at home?

A. Problems I had at home?

Q. Yes.

A. Never discussed them.

(Tr. 221.) Laljie's attorney asked no other questions of Schmeelk as to the alleged affair. However, that course was not forced on him by the court which, as to the alleged affair, had stated, "delve into that all you want" (Pr.Tr.30).

Finally, despite the fact that Schmeelk did not suggest in his testimony that it was impossible for him to have had an affair with Laljie because he suffered from erectile dysfunction, Laljie was not prevented from giving her own testimony that Schmeelk suffered from that condition. Accordingly, she testified, *inter alia,* that Schmeelk had informed her of that condition shortly after they became intimate; and she described that condition as wor-sening toward the end of their relationship.

In sum, Laljie was allowed at trial to testify to what she knew about Schmeelk's condition, to testify that she and Schmeelk had had an affair, and to cross-examine Schmeelk about the alleged affair. We see no abuse of discretion in the trial court's refusal to allow her to harass Schmeelk by questioning him also about his medical condition, an embarrassing subject of tangential relevance.

D. *Sentencing*

In calculating Laljie's sentence under the Sentencing Guidelines ("Guidelines"), the district court, *inter alia,* adjusted her offense level upward by (a) two steps pursuant to § 3B1.3 on the ground that she abused a position of trust, (b) two steps pursuant to § 2F1.1(b)(2)(A) on the ground that the offense involved more than minimal planning, and (c) two steps pursuant to § 3C1.1 on the ground that her trial testimony was perjurious and constituted an obstruction of justice. The resulting Guidelines range of imprisonment was 46–57 months. The court rejected Laljie's request for a downward departure and the government's request for an upward departure, and imposed a prison term of 57 months.

On appeal, Laljie challenges her sentence on the principal ground that the court erred in imposing the enhancement for abuse of a position of trust, arguing that the success of her frauds was due not to her position but rather to the negligence of Schmeelk. She also argues that the court failed to consider her motive and the impact of her offenses on their victim, contending that the court should not have sentenced her at the top of the Guidelines range because, in light of Schmeelk's wealth, the more than $500,000 she was convicted of stealing was "chicken feed" (Laljie brief on appeal at 45) and enabled Laljie "to give [her family] things they never could have had" (*id.*). The second argument, even were it not a legal traves-

ty, is not properly before us, for a lawful sentence within the applicable Guidelines range is not appealable. *See* 18 U.S.C. § 3742(a) (1994). We need discuss only the enhancement for abuse of a position of trust.

■■■ Section 3B1.3 provides for a two-level enhancement to a defendant's offense level if that defendant "abused a position of public or private trust ... in a manner that significantly facilitated the commission or concealment of the offense." Guidelines § 3B1.3. Whether a position that has been abused is a position of trust within the meaning of this section is a question of law, which we review *de novo. See, e.g., United States v. Wright,* 160 F.3d 905, 910 (2d Cir.1998); *United States v. Jolly,* 102 F.3d 46, 48 (2d Cir.1996); *United States v. Broderson,* 67 F.3d 452, 455 (2d Cir.1995). Whether the defendant used that position in a manner that significantly facilitated the commission or concealment of the offense is a question of fact, as to which we accept the district court's findings "unless they are clearly erroneous," 18 U.S.C. § 3742(e). We "give due deference to the district court's application of the guidelines to the facts." *Id.*

In the present case, the district court found the enhancement for abuse of a position of trust appropriate

> because personal secretaries are ordinarily given a great degree of professional and managerial discretion. Specifically, personal secretaries are ordinarily given discretion over such important and significant functions as paying bills for their bosses, handling the employer's checking accounts, putting calls through to the boss.
>
> Anyone who hires a personal secretary knows that a business deal can be lost by a secretary who doesn't pass on a call or does pass on a call dependent on her own discretion.
>
> ... scheduling appointments; ... planning trips, and making deposits in and/or payments for those items, and in

some instances purchasing items with the employer's credit cards[....]

> These matters relate both to business and personal functions. Even with close supervision secretaries usually have substantial discretion over matters of vital importance and personal importance to their employers.

(S.Tr.19.) Although we do not endorse the district court's apparently broad view that the position of personal secretary is inherently a position of trust within the meaning of § 3B1.3, we conclude that the position of personal executive secretary to Schmeelk was such a position.

■■■ "[T]he primary trait that distinguishes" a position of trust from other positions is "the extent to which the position provides the freedom to commit a difficult-to-detect wrong." *United States v. Viola,* 35 F.3d 37, 45 (2d Cir.1994) (internal quotation marks omitted), *cert. denied,* 513 U.S. 1198, 115 S.Ct. 1270, 131 L.Ed.2d 148 (1995). Thus, a position of trust is one that is

> characterized by professional or managerial discretion (*i.e.,* substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature.

Guidelines § 3B1.3 Application Note 1. For example, while the adjustment would apply to a fraudulent loan scheme perpetrated by a "bank executive[ ]," it would "not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk" because the latter positions are not characterized by substantial discretion and scant supervision. *Id.* "An ordinary bank teller receives a precise sum of money at the beginning of each day for which that teller must account penny-for-penny at day's end; the grant of trust is circumscribed by close supervision and audit." *United States v. Melendez,* 41 F.3d 797, 799 (2d Cir.1994).

Accordingly, we have held the abuse-of-position-of-trust enhancement inappropriate for an employee who enjoyed no significant level of discretion, was not by reason of his position subject to relaxed supervision, had no special access to crucial information, and whose misdeeds were easily detectible, even though that employee had actually abused his position to commit his crimes. *See United States v. Viola*, 35 F.3d at 45 (defendant's "position as a forklift operator did not involve a substantial amount of discretionary judgment, and he was not subject to relaxed supervision because of the position").

In contrast, we have upheld application of the enhancement to, for example, the chairperson of a corporation's board of directors, whose high position of authority, lack of supervision, and unlimited check-writing power facilitated her embezzlement of corporate funds, *see United States v. Wright*, 160 F.3d at 910–11; to the treasurer of a homeowners' association who embezzled association funds, *see United States v. Valenti*, 60 F.3d 941, 947 (2d Cir.1995); to an airline's junior station agent whose position provided him with the airline's computer access code, which he used to issue to himself tickets that he thereafter used or traded to others for property or cash, *see United States v. Castagnet*, 936 F.2d 57, 61–62 (2d Cir.1991); and to a postal worker whose position differed from that of ordinary postal employees in that it gave him access to a locked, caged area used to house registered mail, gave him the combination to the safe in that area, and thereby gave him "access to large amounts of cash without ... tight accounting controls," *United States v. Melendez*, 41 F.3d at 799.

The position of private secretary may or may not be imbued with such characteristics. Whether a given position is one of trust within the meaning of § 3B1.3 is to be viewed from the perspective of the offense victims, *see, e.g., United States v. Wright*, 160 F.3d at 910; *United States v. Broderson*, 67 F.3d at 456; *United States v. Castagnet*, 936 F.2d at 62, and the proper characterization of the secretarial position for this purpose will depend on the practice of the employer who is victimized. An employer may trust his or her secretary to write checks for the payment of bills and to make credit-card purchases faithfully with little supervision; or the employer may choose to have those tasks performed in accordance with a procedure that confers no discretion and affords minimal opportunity for fraud or concealment of defalcation.

In the present case, the testimony of Schmeelk, along with that of Laljie's predecessor and successor, clearly reveals that Schmeelk chose to make the position of his private executive secretary a position of trust. Thus, in accordance with procedures used by Schmeelk for nearly a quarter of a century, when Laljie presented him with checks to sign in payment of a stack of his bills, he routinely signed without comparing the checks to the bills. He frequently authorized Laljie to obtain for him large amounts of cash; when he received the cash he never counted it to determine whether it was all there. And he periodically signed and entrusted to Laljie checks that were blank as to amount and payee. Those checks were meant principally for payment of his bills or his family's emergencies if money was needed for those purposes when he was not available; but Schmeelk gave Laljie discretion to determine what circumstances might warrant use of such a check, did not thereafter ask her whether or how those checks had been used, and did not entrust blank checks to substitute secretaries when Laljie was on vacation. Further, such was the degree of trust conferred on the position occupied by Laljie that, although Schmeelk employed an accountant for review of other matters, he did not have the accountant scrutinize the account that was managed by his personal executive secretary. As Laljie herself notes, "[t]he only account not checked by Mr. Schmeelk's accountant, who was paid approximately

$40,000.00 a year, was the account managed by Ms. Laljie...." (Laljie brief on appeal at 11.) Although Laljie contends that this fact shows that Schmeelk was negligent, the district court's conclusion that the lack of supervision reflected not negligence but trust is not erroneous.

The trust conferred on Laljie enabled her to embezzle large sums of money over a substantial period of time, and to elude detection for the entire period of her tenure. We see no error in the district court's application of the abuse-of-position-of-trust enhancement to the facts of this case.

## CONCLUSION

We have considered all of Laljie's contentions that are properly before us on this appeal and, except as indicated above, have found them to be without merit. For the reasons set forth above, the judgment of conviction on counts 24–33, 35–40, 42, 44–48, 50–57, 59–61, and 64–75 is affirmed. The judgment of conviction on counts 62 and 63 is reversed, and the matter is remanded for dismissal of those two counts and for resentencing in light of that dismissal.