UNITED STATES of America, Plaintiff,

v.

Frank ROYSTON, Defendant.

No. 5:01CR30042.

United States District Court,
W.D. Virginia,
at Harrisonburg.

Jan. 30, 2002.

Jean Barrett Hudson, U.S. Attorney's Office, Charlottesville, VA, for plaintiff.

Elton Eugene Gunter, Winchester, VA, Melody Gunter Foster, Richmond, VA, for defendant.

### *MEMORANDUM OPINION*

TURK, District Judge.

A Harrisonburg jury convicted the defendant, Frank Royston, of a one-count violation of 18 U.S.C. § 1344(2), the federal bank fraud statute. He has now moved this Court to set aside the guilty verdict and enter a judgment of acquittal. Because the motion is well-taken, the Court will grant it and find the defendant not guilty of the crime with which he is charged.

The defendant is a prominent member of the Fraternal Order of Eagles (the "Club") in Winchester, Virginia. He was the secretary of that organization for many years, and as such wrote out checks to pay the Club's expenses. Five of those checks are at issue in this case. The Eagles Club annually awarded $12,000 in scholarships to area high school students. The defendant wrote three checks made out to "Scholarship Committee," in the amount of $12,000 each, between November 1995 and October 1996. This was so even though the club awarded a maximum of $12,000 in scholarships in any given year. The defendant then took each of these checks to the F & M Bank in Winchester (the "Bank"), a Federally insured financial institution, and cashed them. A fourth check was originally made out to "F & M Bank" and designated for the payment of FUTA payroll taxes. The defendant altered the check so that it was payable to himself and cashed it. Finally, a fifth check dated July 22, 1996 was made out to "F & M Bank" in the amount of $62,000 and designated for the payment of the deed of trust on the club's building. The defendant orally instructed the Bank to apply only $50,000 to the deed of trust and to apply the other $12,000 to the scholarships for that year, even though the 1996 scholarships had supposedly been paid by the October 1996 check. The bookkeeping records on all five checks did not align with the purported purpose of the checks as reflected on the checks themselves.

State charges arising out of the inconsistencies in the checks did not proceed to trial. A federal grand jury sitting in Charlottesville indicted the defendant for violations of 18 U.S.C. § 1344 (2000), the Federal Bank fraud statute. That statute makes it a criminal act when a person

...knowingly executes, or attempts to execute, a scheme or artifice—

(1) to defraud a financial institution; or

(2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, promises, or representations.

At trial, the Court entered a judgment of acquittal as to § 1344(1). The Court found the evidence insufficient for a jury to conclude beyond a reasonable doubt that the

defendant intended to defraud the Bank. However, the Court submitted the case to the jury on the § 1344(2) charge, which alleged a scheme or artifice fraudulently to obtain money under Bank control.

The jury convicted the defendant. He now challenges those convictions on two grounds, and moves for a judgment of acquittal.[1] First, he claims that under § 1344(2), the United States must show that the defendant intended to victimize the Bank, and that the government has failed to do so here. Second, he argues that the mere presentation of checks procured (perhaps) by fraud does not constitute a "false or fraudulent pretense[ ], promise[ ], or representation[ ]" within the meaning of the statute. Because the Court concludes that the first argument is well-taken, the Court will enter a judgment of acquittal without reaching the merits of the second.[2]

As an initial matter, § 1344(1) and § 1344(2) appear to proscribe two different sorts of conduct. On its face, § 1344(1) prohibits an attempt to defraud a financial institution itself. Section 1344(2), in contrast, prohibits fraudulently attempting to gain control of property (presumably including the property of another) under the care of a financial institution. It does not literally require that the victim of the fraud be the financial institution; that appears to be the purpose of § 1344(1). Given the legal principle that a court will not presume legislative language to be superfluous, one can hardly blame the United States for maintaining that § 1344(1) and § 1344(2) proscribe two entirely different types of conduct, and that Bank victimization is an element of § 1344(1) but not of § 1344(2).

Nevertheless, that is not necessarily the case. Indeed, there appears to be a circuit split on the question what elements are required to sustain a conviction under § 1344(2). For instance, the rule in the Tenth Circuit is that the government need not show a risk of loss to a financial institution to sustain a conviction under § 1344(2). *See United States v. Sapp*, 53 F.3d 1100, 1102–03 (10th Cir.1995).

However, the other circuits have rejected that rule. In the Second Circuit, the government must show that the Bank was an actual or intended victim of the scheme to defraud in order to sustain a conviction under § 1344(2). *United States v. Laljie*, 184 F.3d 180, 189 (2nd Cir.1999) ("Accordingly, although a bank need not be an immediate victim of the fraud, the government is required to prove that a bank was an actual or intended victim."). The government might show this through direct evidence that the defendant was "out to get" the bank. *Id.* ("Actual or potential

1. The defendant also argues that the Court's comments during the trial unfairly prejudiced the jury against the defendant, and that a mistrial is therefore warranted. Because of its disposition of the case, the Court need not express its opinion regarding this argument.

2. The defendant may have a point with his second argument as well, however. The Virginia Uniform Commercial Code provides that any person negotiating commercial paper warrants to the acceptor that the person is entitled to enforce the instrument, that the signatures on the instrument are authentic and authorized, that there has been no alteration to the instrument, that it is not subject to defenses, and that the drawer or drawee of the instrument is not insolvent. Va.Code § 8.3A–416. Mr. Royston arguably breached his presentment warranties here. However, the Supreme Court has implied that breach of a U.C.C. presentment warranty is not enough to constitute a fraudulent misrepresentation under federal criminal law. *Cf. Williams v. United States*, 458 U.S. 279, 284–85, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982) (construing 18 U.S.C. § 1044); *United States v. Medeles*, 916 F.2d 195 (5th Cir.1990) (applying *Williams* rationale to § 1344). In any event, the Court bases its holding on the argument that the Bank was not the intended victim of the fraud in this instance.

loss to the bank need not be proven, so long as there is evidence that the defendant intended to expose the institution to such a loss...").[3] In the alternative, the government may show bank victimization by showing that the defendant's actions, whether they were intended to or not, exposed the bank to an actual or potential risk of loss. *United States v. Rodriguez*, 140 F.3d 163, 168 (2nd Cir.1998) (government must show that defendant "intended to victimize the bank by exposing it to actual or potential loss"). The Second Circuit cases on this subject appear to turn on whether there is a chance that the Bank will be civilly liable because of the defendant's misconduct.[4]

The Fifth Circuit's cases are in accord with those of the Second Circuit. "In a section 1344[ ](2) case, it is... necessary that the custodial bank be exposed to the risk of loss, i.e., exposed to civil liability." *United States v. Briggs*, 965 F.2d 10, 12–13 (5th Cir.1992). Similarly, the Fifth Circuit reversed a bank fraud conviction because of the insufficiency of the evidence in *United States v. Sprick*, 233 F.3d 845 (5th Cir.2000), and associated § 1344(2) with the threat of civil liability. In that case the government presented an expert witness on the subject of bank liability. When the United States Attorney asked the witness whether the bank would be liable, the witness replied only that "anything's possible." The Fifth Circuit reversed the conviction because the expert's lukewarm assessment of liability was insufficient to support it, and the government "presented no other evidence and referred us to no legal authority demonstrating" that the bank could be liable on *Sprick's* facts. *Id.* at 853. Under *Sprick*, the government must provide a basis for the jury to conclude that the bank faced civil liability. *Id.*

■ Naturally this Court is most concerned with the jurisprudence of the Fourth Circuit. There is no explicit holding from that court but after review of what § 1344 cases there are, this Court is convinced that the Fourth Circuit would adopt the reasoning of the Second Circuit and the Fifth Circuit. The only case that

---

**3.** If it has this type of evidence, the government might as well pursue it case under § 1344(1).

**4.** For instance, in *Rodriguez*, the defendant was entitled to a judgment of acquittal because the bank had taken the checks as a holder in due course. Rodriguez's co-conspirator had mixed checks payable to Rodriguez with legitimate checks in a pile of checks for the co-conspirator's employer, the account holder, to sign. When the bank demanded payment, the account holder's only defense was fraud in the inducement—that he did not know that the checks he signed were for illegitimate purposes. Fraud in the inducement is no defense against the claims of a holder in due course. U.C.C. § 3–305(b). Thus, the bank could not have lost money and Rodriguez did not commit bank fraud.

To understand the distinction, it is helpful to contrast *Rodriguez* with *United States v. Morgenstern*, 933 F.2d 1108 (2nd Cir.1991). Morgenstern presented legitimate checks to his employer for signature. *After his employer signed the checks*, Morgenstern altered both the payee and the amount. He then deposited them in his account, and the bank credited his account for the full amount of the checks as altered. Morgenstern's employer refused to honor the checks. It is unclear whether the bank in *Morgenstern* was a holder in due course. If it was not, then the Bank would have lost whatever money it had deposited into Morgenstern's account and which Morgenstern had already withdrawn and spent; alteration is a defense when a non-holder in due course requests payment of commercial paper. U.C.C. §§ 3–407(b); 3–305. If the bank was a holder in due course, of course, it could enforce the instrument against Morgenstern's employer to its original tenor. U.C.C. § 3–407(c). That would still leave the bank liable for the difference between the original amount and its altered amount. Thus, there was a real threat of loss to the bank and the Second Circuit affirmed Morgenstern's conviction.

is even marginally helpful is *United States v. Orr,* 932 F.2d 330 (4th Cir.1991). There the defendant opened a new checking account, deposited some money, and then immediately drew down the account to a negative balance. He then negotiated checks from the account "to unsuspecting merchants for sundry merchandise." *Id.* at 330. The government charged Orr with violating both § 1344(1) and § 1344(2). The Fourth Circuit found no violation of *either* section because the bank, which had dishonored the checks for insufficient funds, "suffered no loss at all." *Id.* at 332. The Fourth Circuit cited the Second Circuit's reasoning with approval and stated that Congress did not intend for the statute to apply unless the fraud victim was a federally insured bank. *Id.* Thus, the Fourth Circuit appears to be of the view that both sections of the statute require bank victimization. The primary method by which victimization is proven under § 1344(2) is by showing that the bank was at risk for a financial loss in a civil suit.

The Court finds the other Fourth Circuit cases that the government cites inapposite. *United States v. Wilkinson,* 137 F.3d 214 (4th Cir.1998) is difficult to comprehend because the court produced no majority opinion on the bank fraud issue. However, two judges appeared to state that bank victimization *was* a requirement of the statute.[5] The government also cites a recent case, *United States v. Colton,* 231 F.3d 890 (4th Cir.2000), for the proposition that an actual or potential risk of loss is an element of § 1344(1), but not § 1344(2). However, the case does not stand for this proposition. In *Colton,* the Fourth Circuit considered a conviction under § 1344(1), and commented that subsections (1) and (2) proscribe two different types of conduct. *Id.* at 897. The Court of Appeals then went on to discuss the requirements for a conviction under § 1344(1). In doing so, it noted that the difference between (1) and (2) is that (1) allows conviction without an affirmative fraudulent misrepresentation but (2) requires one. *Id. Colton* does *not* hold that bank victimization is not an element of § 1344(2).

■ In light of the case law, the government's proof here was deficient in at least three ways, any one of which would require a judgment of acquittal.

First, the government offered no evidence that the bank suffered a potential loss during its case in chief. At the close of the government's case, the defendant moved for judgment of acquittal. The Court took the motion under advisement. According to Rule 29(a), *Fed.R.Crim.P.,* when a court takes a motion for a judgment of acquittal under advisement and later rules on it, it must base its decision on the case as it existed at the time of the ruling. What evidence about potential loss there was came in only after the motion, so the Court can not consider it. For all intents and purposes, the government failed to present any evidence on the issue of potential loss and an acquittal is therefore required.

■ Second, even if the Court did consider the evidence it did not show with

---

**5.** Judge Widener found that the bank *was* at risk of loss because of the usual financial relationship between the defendants and the bank. "Except in the very unusual circumstances of this case, I think the evidence probably would be been insufficient to support the verdict because other than the [financial arrangement], *there was no apparent risk of loss." Id.* at 231 (Widener, J., concurring in part and dissenting in part). Judge Niemeyer, likewise, found no bank fraud. *Id.* (Niemeyer, J., concurring in part and dissenting in part). Judge Hamilton voted to affirm the conviction based on his belief that the government showed potential loss under § 1344(1), and without addressing § 1344(2). *Id.* at 233 (Hamilton, J., separate opinion).

substantial certainty that the Bank was subject to a potential loss. The witness who testified most about the effect actions like the defendant's has on the Bank was Betty H. Carol, the chief executive officer of F & M Bank. In essence, she testified that is was possible for the Eagles to question the Bank about the Bank's disposition of the checks at issue. She never said, however, that the Bank was likely to be liable on any of the checks. A lawsuit was possible, but as to liability, the witness would "fight you on that." *Transcript (Clerk's File No. 22)* at 48, line 18. A mere metaphysical possibility that a bank will lose a lawsuit surrounding a fraudulent instrument is not enough to create criminal liability under § 1344(2). *See Sprick*, 233 F.3d at 853 (expert opinion that "anything's possible" regarding liability of bank not enough to support federal bank fraud conviction). Whatever the exact level of proof required, the Court is satisfied that the government must show some possibility of loss greater than the threat of a lawsuit in order to satisfy its obligations under § 1344(2). It has failed to do so here.

Finally, the Court's independent analysis of the question shows that the Bank could not be liable under Virginia law on this evidence for cashing the checks at issue here. With regard to the scholarship checks and the transfer of $12,000 for the loan check, the payee was perhaps fraudulent. However, the signatures were authorized. As in *Laljie*, "the government has called to our attention no principle of statutory law, common law, or business practice that makes a bank responsible for knowing to what entities the owner of the account might make payments." *Laljie*, 184 F.3d at 191. The Bank's responsibility

is simply to pay when told and not to pay when not told to pay. Va.Code § 8.4–401(a). Here, they were told to pay with signatures that matched those on the signature cards. In an action by the Eagles to collect the moneys allegedly paid improperly, the fact that the bank was a holder in due course would defeat the Eagles' contention that the checks were the unauthorized products of fraud in the inducement. Va.Code § 8.3A–305.

With regard to the FUTA check, there is a set of circumstances under with the Bank might be liable; however, the government has introduced no evidence that those circumstances exist. The problem with the FUTA check is that the payee was altered from "F & M Bank" to "Frank R. Royston." The UCC provides that "an alteration fraudulently made discharges a party whose obligation is affected by the alteration." Va.Code § 8.3A–407(b). The Eagles might be discharged from the obligation; thus, they might collect the amount of the FUTA check from the Bank. However, § 8.3A–407 only applied when the alteration is "unauthorized." Va.Code § 8.3A–407(a). Here, none of the other drawers of the check could remember whether they signed the check before or after the defendant altered the payee. If they did so afterwards, the alteration was authorized, the case is one of fraud in the inducement, and the Bank is not liable.[6] One is just as likely as the other. Under these circumstances, the conviction cannot stand.

### CONCLUSION

It is painfully apparent, as the Court commented at trial, that there was considerable "hanky-panky" going on with the

---

6. Even though the bank might not be a holder in due course in this situation because the tellers could have seen the white-out on the check, *see* Va.Code § 8.3A–302(a)(1), the Ea-

gles would have ratified the alteration by signing the check on which it appeared; thus, they would be precluded from asserting it. Va.Code § 8.3A–407(b).

bookkeeping at the Winchester order of Eagles during the late 90's. At best, the defendant is guilty only of sloppy bookkeeping and serious errors in judgment. At worst, he was engaged in an elaborate conspiracy to defraud the Commonwealth's Charitable Gaming Commission out of its tax revenues.[7] For some reason that this Court cannot imagine, the Commonwealth did not proceed against the defendant in state court. However, under the law, that is the proper forum for what is in essence either an embezzlement charge or a civil suit in equity for breach of fiduciary duty.

It follows that the defendant's conviction must be vacated and a judgment of acquittal entered. An appropriate order will this day enter.

---

7. The evidence at trial indicated that the proceeds of the checks made out to "Scholarship Committee" were actually used to make cash payments to the Eagles' delegates to their national convention. These funds went to defray the delegates' entertainment expenses. At the time, the Gaming Commission considered scholarships a non-taxable expense, but required the Eagles to pay tax on entertainment expenses. The incentive to label so many checks "scholarship committee" is too obvious to require comment.