UNITED STATES of America,

v.

Paul MARINO, Defendant.

Nos. 95 CR 0097–02(ADS), 95 CR 0571–01(ADS).

United States District Court, E.D. New York.

May 17, 2002.

Alan Vinegrad, United States Attorney, Eastern District of New York, Brooklyn, NY, by Leonard Lato, Assistant United States Attorney, for U.S.

Raymond Grunewald, New York, NY, for Defendant.

### MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

The most fundamental condition of supervised release is not to commit another crime while under supervision.

In this proceeding, the defendant Paul Marino (the "releasee" or "Marino") is charged with violation of supervised release in that he committed a federal crime while on supervised release.

### I. BACKGROUND

In a violation of supervised release report dated February 11, 2002, Marino was

accused of filing a fraudulent insurance claim by mailing documents containing false and fraudulent statements to Prudential Property & Casualty Co. ("Prudential"), located in Richmond, Virginia.

In particular, this charge involves an alleged burglary on May 9, 2001, at the home of Marino's grandmother, Theresa Proscia, at 61–30 166th Street, Fresh Meadows, New York. This residence is a single family home owned by Proscia and insured by Prudential with a homeowner's policy. Marino resides in this residence with his grandmother. As a result of this alleged burglary, the releasee filed a claim with Prudential requesting reimbursement for an alleged loss of $19,391. This sum resulted from the reported theft of boating equipment, a generator and tools that were stored in a shed located near the residence, which allegedly was broken into by the perpetrators. On June 11, 2001, the releasee faxed photographs of the alleged stolen items to Prudential. On June 28, 2001, the releasee mailed to Prudential a list of the alleged stolen items, together with receipts.

In July 2001, Prudential commenced an investigation into this matter. The investigation raised the suspicion of altered or manufactured receipts. In November 2001, the releasee mailed to Prudential, a "Statement in Proof of Loss" containing a property worksheet detailing the items allegedly stolen from the shed. The Prudential investigator noticed inconsistencies in the property worksheet.

On September 19, 2001, the Prudential investigator concluded her investigation and recommended denial of the claim based on the submission of altered and fraudulent documents and receipts. On January 4, 2002, Prudential formally denied the claim and canceled Proscia's insurance policy.

## II. *THE HEARING*

A hearing on the violation of supervised release charge was held on May 3, 2002 and May 10, 2002. The first witness called by the Government was Julia Moody, employed by Prudential as a case theft investigator. The Court found Moody to be a very credible witness. Her testimony was responsive, candid and crystal clear.

On May 10, 2001, Moody took a recorded statement from Marino. He related that he had reported the break-in and theft to the police. He noticed damage to the shed and back window of the residence but there was no actual entry into the residence. Marino told Moody that one outboard motor, a navigation system, tools, a generator and boating materials were taken from the shed. Marino stated that the items were owned by his grandmother and himself. He was a covered insured under the policy. Moody advised the releasee that Prudential required (1) a detailed list of the items stolen; (2) how long the items were possessed; (3) the value of each item; and (4) proof of ownership of every item over $100 in value. In this conversation, Marino advised Moody that he was a computer sales representative. Moody then sent Marino a "Document Request Letter."

In response, on June 28, 2001, in the mail, Moody received from Marino (1) a completed Prudential form entitled "Property Worksheet" (Govt.Ex.1); (2) a Shane's Marine invoice (Govt.Ex.2); and (3) a Hilti Tool Co. invoice (Govt.Ex.3).

After receiving these documents, Moody commenced the claim review process. On July 2, 2001, the releasee called Moody and asked about the status of the claim. Moody told him that she needed proof of ownership of certain items including the Honda generator, which is the first item set forth on the Property Worksheet (Govt.Ex.1). Marino said he would find

the receipt for this item. The next day Marino faxed Moody a copy of the credit card invoice for the Honda generator and a copy of the actual Sunrise Honda invoice, both in evidence as Govt. Ex. 4.

Moody had a problem with the Honda credit card invoice. The date on the invoice was 6/25/00. It looked to Moody that the last zero was altered; namely, that 01 was changed to 00. Also, with regard to the Sunrise Honda invoice, it looked like some writing was darker than other writing. Further, the date on the invoice looked like it was also altered to look like "00". In addition, the purchaser's name on the top of the invoice was printed "Theresa Proscia," while the signature of the purchaser on the lower right-hand corner of the invoice "does not look like Proscia, that looks like an E."

Moody then called Sunrise Honda and spoke with the salesperson who sold the generator, a person named Harry, which name also appears on the invoice as "sold by." Harry told Moody that he did not know of anyone who bought a generator under the name of "Theresa Proscia." Harry told Moody that he did sell this generator but not to Proscia. On 6/25/01 he sold the generator to one William Egan, and he faxed Moody the invoice involved in that sale. The faxed Sunrise Honda invoice of the sale of the generator to William P. Egan, 115 Lake Shore Drive, Pleasantville, New York 10570 (Govt.Ex.5) is identical to the invoice sent by Marino (Govt.Ex.4) except that the purchaser's name and the date have been changed. In the invoice sent by Marino, Egan's name was removed and Theresa Proscia's name was substituted. Also, the date on the Egan bill, 6/25/01, was altered to read 6/25/00. These alterations are obvious and clear:

Q Did you look at Government's Exhibit 5 and compare it to Government's Exhibit 4?

A Yes.

Q And just again for the record and to make it clear here, Government's Exhibit 4 are the papers that Mr. Marino sent to you; Government's Exhibit 5 are the papers you received directly from Sunrise Honda?

A Yes.

Q When you examined the two documents side-by-side—and let's look at page one, the invoice—what did you determine?

A That is was altered.

\*　　\*　　\*　　\*　　\*　　\*

THE COURT: Looking at these two documents, 4 and 5, to me they look almost identical in most respects except for the name in the right upper corner, purchaser's name.

Is that right?

THE WITNESS: Yes.

THE COURT: Are they identical otherwise?

THE WITNESS: No.

THE COURT: What?

THE WITNESS: No.

THE COURT: What is different about them?

THE WITNESS: The date.

THE COURT: Oh, the date on Government's Exhibit 4, the Proscia bill, is dated—let's see. It's very hard to read these things. Good thing I'm not a salesman.

June 25, 2000, right?

THE WITNESS: Yes.

THE COURT: And the date on Government's Exhibit 5, the Egan bill, is July—June 25, 2001?

THE WITNESS: Yes.

THE COURT: And the name on Government's Exhibit 4 is Theresa Proscia with an address in Flushing?

THE WITNESS: Yes.

THE COURT: The name on Government's Exhibit 5 is William P. Egan with an address in Pleasantville, New York?

THE WITNESS: Yes.

THE COURT: Other than that, are they the same?

THE WITNESS: Yes.

BY MR. LATO:

Q To put it another way, based upon your observation, you determined that someone altered Government's Exhibit 4 to make it look like Government's Exhibit 5, correct?

A Yes.

* * * * * *

Q Would it be fair to say that in comparing the receipts on Government's Exhibits 4 and 5, it looked like someone took Government 4, changed the date and eliminated any reference to William Egan at the bottom? Is that correct?

A Yes.

Tr. at 27–29.*

Let the record indicate, that the Court was advised, in previous proceedings, that one Maureen Egan–Amato is the releasee's girlfriend. Also, Marino noted his address on the police report as 45–85 Virel Avenue, Apt. 1B, Bronx, New York, which the Supervising Probation Officer knows to be the home address of Maureen Egan–Amato.

On November 7, 2001, Moody sent a proof of loss form to Proscia/Marino, by regular and certified mail. On December 11, 2001, Moody received a completed form, dated December 6, 2001 and signed and notarized by Theresa Proscia (Govt.Ex.6). The proof of loss made a claim in the sum of $19,391. On January 4, 2002, Prudential sent a letter to Proscia/Marino denying the claim.

The Court further notes that the damage to the shed as a result of this alleged "break-in" was apparently minimal. On May 30, 2001, Prudential paid for a lock on the shed in the sum of $13.41.

William Caporizzo is the City Manager for New York of Hilti, Inc., an Oklahoma company. He is familiar with the Hilti records. Caporizzo was shown the Hilti invoice submitted by Marino (Govt.Ex.3). He testified that, based on the date of the invoice, 10/21/00, it is not authentic, because this type of form ceased to be in existence on July 5, 1995 and was no longer used after that date.

In addition, there is another patent misrepresentation on the invoice which demonstrates that it is not authentic. The address on the invoice is Northern Boulevard in Woodside. In fact, Hilti moved from that address in 1987 or 1988. Further, the salesman named in the invoice, Michael Burke, ceased being employed on May 19, 1990; yet, the invoice is dated October 21, 2000. Also, Manager Caporizzo testified that he reviewed the company records and there was no recorded sale to a Proscia or a Marino, going back to July 5, 1995. Here is the relevant testimony by Caporizzo:

Q Based upon your familiarity with the recordkeeping and your work at Hilti Tools, how do you know that this is not an authentic Hilti document when you consider the date of October 21 of 2000?

A When I consider that date, this form was—the way it is right now, ceased to be in existence when we went from an IBM mainframe computer system to an Oracle-based system, which took place on July 5 of 1995.

At that point in time this form, the way I'm looking at it right now, became obsolete. It was no longer used.

* Tr. refers to the hearing transcript.

Q Now, is there something else on the form that suggests, other than the form itself, that this document could not have been produced in 2000 or even as early as '95?

A There are a number of other things.

Q Such as?

A Well, up on top where it says "Northern Boulevard, Woodside, New York"—

THE COURT: Just hold it a minute, please. Hold it.

You may proceed.

A The Northern Boulevard, Woodside, New York, location for us was not in existence during the year 2000. We had actually moved out of that location. I don't remember the exact date; I suspect it was somewhere back in 1987 or '88.

But we actually had moved that operation to Long Island City, New York, which is also on Northern Boulevard, but the Woodside, New York, location on Northern Boulevard was not in existence for us in the year 2000.

BY MR. LATO:

Q Is there anything else on that page that suggests that this is not an authentic document?

A The other thing that I can see that does suggest that is the salesman's name, Michael Burke, B–U–R–K–E.

Q Can you just slow down a bit?

Again, where you said "order date" before, it's on the same line. Order date, order number, then SLS number. I guess that's a sales number, correct?

A Yes.

Q And the SLS or salesman's name?

A Yes.

Q And there's an entry, "Michael Burke"?

A Yes.

Q Why couldn't Michael Burke have been the salesman on this order in the year 2000?

A Michael Burke was employed with us from February 20, 1979, and his last day of employment with Hilti was May 10, 1990.

Q Now, finally, sir, prior to testifying today, did you check with Hilti to see if Hilti has any records of ever having done business with either Theresa Proscia or Paul Marino?

A In checking with Hilti, prior to my meeting here today, Theresa Proscia and Michael Marino—

Q Paul Marino.

A Paul Marino.

—they have no records going back to July 5 of 1995, which was when our new Oracle system came into play. They did not have any records prior to that, which was the old IBM mainframe system.

THE COURT: Just hold it a minute, please.

MR. GRUNEWALD: Judge, excuse me. Can I get a five-minute recess?

THE COURT: Yes, go ahead.

(Brief recess.)

THE COURT: All right. Let's proceed.

MR. LATO: Sorry, your Honor, may I have the last question and answer read back.

THE COURT: No, you don't need the last question and answer back.

He said he checked with Hilti, and he has no record of doing business with Proscia and Marino going back to July of 1995.

BY MR. LATO:

Q I'm sorry, sir, could you check back further than '95?

A We really can't.

Tr. at 74–77.

Interestingly, on cross-examination of Caporizzo, it was revealed that one of the items on the invoice, designated TE–92 DLX has not been sold by Hilti for the last seven years; another false statement in the invoice.

On cross-examination, Marino testified about the Hilti documents (Gov't Exh. 3):

Q Now, let's talk about Government's Exhibit 3, Mr. Marino.

What is this, a packing slip from Hilti (handing)?

A Yes.

\* \* \* \* \* \*

Q Now, Mr. Marino, you filled in most of what is on Government's Exhibit 3, correct?

A Yes, I did.

Q And where did you get that form?

A From—the form itself? It came from an old purchase of a couple of bits that were used to demolish my grandmother's old porch in the back that was made out of concrete.

Q So you took the old form, whited it out and filled in the information that is currently on it, correct?

A Yes.

Q And you also changed the dates, correct?

A Yes, I did.

Q Now, when you sent this to Prudential, did you tell them essentially what you just told the Court?

A Yes, I did.

Q So it's your testimony—

A No, no, no, I'm sorry. That I whatchamacallit—that I whited out an old thing?

Q Correct.

A No, I told them I was sending them a reference with a valid, whatchamacallit, model numbers, so they could do the

proper pricing and the date for depreciation.

\* \* \* \* \* \*

Q Well, that has the Hilti name on it, correct?

A It's not a letterhead, it's a packing slip.

Q All right, Mr. Marino, you sent Prudential something, a piece of paper with a Hilti packing slip logo on it, correct?

A Yes.

Q It says "Hilti"; isn't that correct?

A Yes.

\* \* \* \* \* \*

Q Mr. Marino, Government's Exhibit 1, the property work sheet, and Government's Exhibit 3, side-by-side, the packing slip from Hilti, you filled out both, correct?

A Yes.

Q When you sent in Government's Exhibit 1 that you filled out, they said that is not sufficient, give us proof of ownership, correct?

A No, they were sent in at the same time.

\* \* \* \* \* \*

Q And you are telling the Court that in using the Hilti letterhead you were not trying to deceive Prudential into thinking you had acquired this from Hilti?

A That's what I'm saying, yes.

Tr. at 210–14.

The Court finds that the Hilti invoice, mailed to Prudential through the United States mails by Marino, is loaded with false statements that the Court finds to be fraudulent.

Douglas Brenner is employed by West Marine as a store manager in Port Jefferson. Previously, he worked for Shane's Marine, a boat dealership in Freeport. He is familiar with the records of West Ma-

rine. A copy of the Shane's Marine bill, dated 8/27/00 (Govt.Ex.2), that Marino mailed to Prudential, was sent to Brenner by Prudential for an opinion as to its validity. Brenner testified that the invoice, Govt. Ex. 2, was not authentic because, on 8/27/00, Shane's Marine did not exist, having been purchased by West Marine in 1994.

Marino's testimony on cross-examination also sheds some light on this subject.

Q Did you alter Government's Exhibit 2 in any way?

A No.

Q Mr. Marino, is that a receipt that the owner gave you or the one that he probably got when he bought it?

A You're asking for an assumption. That's probably the one he got when he bought it. I don't know.

Q What is the date on the Shane's receipt?

A 8/27/2000.

Q That's pretty much the date you bought it, correct?

A Yeah. Close.

Q Now, Mr. Marino, it would be fair to say that on 8/27/2000 there was no Shane's Marine?

A Yes.

Q Just like in Government's Exhibit 3, that packing slip, was not in existence at the time you supposedly acquired those tools, correct?

A Yes.

Q It's your testimony that you did not alter Government's Exhibit 2 in any way?

A I didn't touch Government's Exhibit 2 in any way.

Q It's your testimony that you got a receipt of barely legible quality that has a purchase date of August 27, 2000?

A No, the original receipt was light blue. It was very legible, and I sent it to Prudential. That's just the copies they sent back.

Q But it still had that date of August 27, 2000?

A Yes.

Q Even though Shane's had not been in existence for several years?

A Yes, which I had no knowledge until this court thing.

Tr. at 222–23.

The Court credits this unrefuted testimony and finds that the Shane Marine bill submitted to Prudential by Marino, was a bogus document and contained false, fraudulent and material misrepresentations.

Joseph Lisi, a former New York City police officer, is a self-employed private investigator. Lisi did investigative work for Prudential in the Proscia/Marino claim. In August 2001, Lisi interviewed the releasee at the Proscia residence in Flushing. He questioned Marino about the Sunrise Honda bill and receipt (Govt.Ex.4). Lisi told Marino that the receipt attached to the Sunrise Honda bill was not his receipt and was not the right receipt. Marino responded that "it was sent to him and that he just had to forward it quickly to Prudential because they needed it, they needed something." (Tr. at 89.)

Richard James is the United States Probation Officer who has been supervising the releasee for more than three years. As a standard condition, a person on supervised release must list his assets. Marino never mentioned that he owned a boat. Probation Officer James was shown the receipt from Sunrise Honda (Govt.Ex.4). He was referred to the upper right portion of the receipt—the place for the purchaser's name and address. The name of the purchaser is Theresa Proscia, 61–30 166th Street, Flushing, New York 11365. It is assumed in that type of document, a re-

ceipt or invoice by Sunrise Honda, that the purchaser's name would be filled by the Honda salesman. James testified that he recognized the handwriting "as that of being Paul Marino." (Tr. at 97). James also stated that the Property Worksheet (Govt.Ex.1) listing all the items allegedly stolen, was in Marino's handwriting.

Paul Marino testified on his own behalf. He has been living in his grandmother's home "on and off" for about four years. He stated that in May 2001, his grandmother Theresa Proscia did have a contract with a security firm called ADT. Marino described the shed attached to the back of the house, which was locked and in which he kept "things." On May 5, 2001, he received a phone call from the "alarm company." At that time he was at the home of his girlfriend Maureen Egan, in the Bronx. After the phone call, Marino immediately went to his grandmother's home. The alarm "was going off." No police were there at the scene. He called the 107th Precinct and then 911 and a police radio motor car with two police officers arrived. The police asked Marino to vacate the premises and they searched and secured the house, with guns drawn. The lock to the shed was sawed and various garden equipment and shovels were thrown on the lawn. A window screen on the side of the house "had been popped out." Marino called for the crime squad, but they did not come for several days. Marino testified that he kept things of value in the shed.

Marino testified that the police officers at the scene showed him evidence of the alleged burglary. Two days later, the police took fingerprints and did certain forensic investigations, but were unable to ascertain the identity of the parties responsible. Also, Marino produced documentary evidence that the Tri–Star Security System furnished security alarm service at the Proscia residence.

Marino called Prudential to advise them of the burglary and loss of the personal property. Prudential sent him forms to be completed. Marino himself filled out the "Property Worksheet" (Govt.Ex.1) listing all the items claimed to have been stolen. Because he didn't have the original receipts, he explained how he got the cost prices:

A  Being I didn't have original receipts for this, which I told the insurance company and their special investigator, at all times I went on the web sites and I got the current price and filled in where it was the original cost.

Tr. at 132.

Marino described the items in the "Property Worksheet" he filled out, as follows:

A  A Honda generator, a Hilti hammer drill.

THE COURT: You have to go slow.

THE WITNESS: I'm sorry. A Hilti hammer drill; Hilti diamond core bits, several of them; a Hilti fastening gun called a DX–350; North Star navigation unit; Hilti extension pole for the DX–350; the Si–Tex boat depth finder.

THE COURT: That's your handwriting, Mr. Marino?

THE WITNESS: Yes, it is.

The second page lists the smaller generator.

Tr. at 132.

Marino told Prudential Claims Investigator Julia Moody that he did not have original receipts, and she told him that photographs and the original owner's manuals are acceptable. According to Marino, Moody told him "send me anything ... that could show me and this company that you actually had this stuff." (Tr. at 134).

Marino then proceeded to explain the Hilti document in evidence as Govt. Ex. 3 (also in evidence as Def. Ex. D–1). This is

the same document that William Caporizzo testified was not authentic. According to Marino, Govt. Ex. 3 is an "old blank packing slip" and not an invoice.

THE COURT: I'm confused.

THE WITNESS: Tell me where you lost me, and I'll start again.

THE COURT: Defendant's Exhibit D–1, you say you were told to change this?

THE WITNESS: No, no. This was a blank packing slip. I wasn't told to change anything.

THE COURT: This was a blank?

THE WITNESS: Where you see "item description," the bottom half of this form was blanked out.

THE COURT: The bottom was blanked out?

THE WITNESS: Yes, where the items were listed. There's 15 items listed on the bottom of this form. None of these items were in here when this slip was first prepared. These were all put in by me from the Hilti web site.

\* \* \* \* \* \*

THE COURT: How about the top portion?

THE WITNESS: The top portion was correct. Because myself, my family, father, brother, everybody in my family were contractors. We've been longtime customers with Hilti, both myself and the companies.

Where it says "order date," there's 2000 put in there, which was put in by myself for depreciation of the tools.

THE COURT: So you did change the date. You did add the numbers?

THE WITNESS: Yes, yes, I did.

THE COURT: You put in this date?

THE WITNESS: Yes, for reference only. This was not ever submitted as an original document. She was told this and the investigator was told this, which I believe he told you under oath.

THE COURT: You inserted the date October 21, 2000?

THE WITNESS: Yes.

THE COURT: What was that date intended to mean?

THE WITNESS: That was for reference when she looked up these item numbers for their current value and applied the proper depreciation.

THE COURT: Who is "she"?

THE WITNESS: Julia Moody.

THE COURT: What's the time of purchase?

THE WITNESS: It was in 2000, the summer of 2000. So she got to apply two years' depreciation on all these tools.

THE COURT: The date is October 21, 2000. Is that the date of purchase?

THE WITNESS: Yes.

BY MR. GRUNEWALD:

Q Is that an estimated date?

A Give or take, yes.

THE COURT: You may proceed.

BY MR. GRUNEWALD:

Q And then you inserted the items you recall from having owned these tools, you put down a list of all those tools that were stolen; is that correct?

A Yes. There's only two tools here. The rest are all bits and accessories.

Q And you gave the catalogue numbers?

A Yes, straight from the web site.

Tr. at 136–38.

Marino explained that his purpose in sending the Hilti document was to show "some sort of proof of ownership" and "was never submitted as an original document to prove ownership." The Court does not credit this testimony. The Court finds that this "old packing slip" was intentionally altered by the defendant to add a

date and items, and it was intended to deceive the Prudential Insurance Co.

Marino also produced a number of photographs of tools, taken in the home of William Egan, the brother of his girlfriend. It seems that Marino was doing some construction work in the basement of William Egan's home. The photographs were submitted to show that these tools existed and were owned by him.

Marino then turned to the Shane's Marine document, Govt. Ex. 2 (Def.Ex.D–14) which described a Si–Tex depth finder for a selling price of $2237.65 and is dated 8/27/00. It looks like an invoice for that item. The Court recalls that Douglas Brenner testified that this document was not authentic. Marino testified that the Shane Marine invoice was really a "copy of a receipt that was in the depth finder, the Si–Tex depth finder box that I purchased used . . . It was folded up in the bottom of the box of what was left of the equipment." (Tr. at 147). Marino further explained this strange occurrence:

Q  And where did you find—where did you get the Shane's Marine receipt, Exhibit D–14? Where did you get that from?

MR. GRUNEWALD: Which is Government's Exhibit, 2, your Honor.

THE WITNESS: The Shane's Marine receipt was folded up in the owner's manual that was provided when I bought this unit used from a man in—who kept his boat in Surf Side 3 Marina in Lindenhurst.

THE COURT: I didn't get that. You say Government's Exhibit 2 was found where?

THE WITNESS: I found that receipt folded up in the Si–Tex owner's manual in the bottom of the box from when I purchased the unit from a man who owned a boat at Surf Side Marina in Lindenhurst, Long Island.

THE COURT: When you purchased what, the boat?

THE WITNESS: No, when I purchased this unit.

THE COURT: So you purchased this unit from an individual?

THE WITNESS: Yes.

THE COURT: Who did you purchase it from?

THE WITNESS: The man's name was Frank. I don't know his last name. I answered—I frequently go to a store called Freeport Marine.

*     *     *     *     *     *

THE COURT: Excuse me. You purchased this in the summer of 2000?

THE WITNESS: Yes.

Tr. at 150–51.

Marino further testified about events and produced photographs and records designed to show that the Si–Tex depth finder and the Northstar 952XDL actually existed and that he owned them in the year 2000, which was prior to the theft, which occurred on May 9, 2001. Marino testified that he paid $4649 for the Northstar unit, which was paid in money orders in $700 denominations; with money lent to him by Maureen Egan.

The defendant's problems in this case came to a head with his testimony with regard to the Sunrise Honda invoices (Govt. Exhs. 4 and 5). Marino stated that the Honda generator was to generate electricity for Proscia's home. Marino testified that he purchased the Honda generator at a store called Iacona Equipment in Flushing, Queens. He did not have an original receipt for the purchase from Iacona. He tried to find the store and obtain a receipt but both Iacona stores, one in Flushing and one in Lindenhurst, are now out of business. Marino finally located one Ignacio Iacona, who was the original owner of the stores. Iacona told him

that both stores have been closed and he operates from a trailer. To show that the Iacona store actually existed the releasee offered a September 9, 1994 invoice from the Iacona Equipment located at 161–20 40th Avenue in Queens. This receipt was for a smaller Honda 1000 generator that Marino bought for construction purposes.

The scenario described by Marino is that he purchased the Honda generator at issue from Iacona Equipment Co., which was now closed, without a receipt. The question was then posed by his counsel to Marino—what was he to do, to recover the money value of the Honda generator from Prudential? The following excerpt of Marino's testimony as to the Sunrise Honda invoices (Govt. Exhs. 4 and 5 and Def. Ex. G) is crucial in the determination of issues of intent to deceive and credibility at the Hearing:

BY MR. GRUNEWALD:

Q So what did you do?

Now I'll show you Defendant's Exhibit G, which consists of three pages, and you can tell us what they are.

And there is also a government's exhibit, your Honor, Government's Exhibit—just one minute and I'll tell you.

THE COURT: It's Government's Exhibit 5.

MR. GRUNEWALD: Yes. Yes, sir, that's correct.

THE WITNESS: Right.

MR. GRUNEWALD: Right.

BY MR. GRUNEWALD:

Q Now, when you were unable at this juncture to find the Iacona store and you were in the process of trying to get the insurance company to come up with the funds for your claim and looking for evidence of your loss, what did you do in connection with the generator?

A Okay. This is going to be a little lengthy and maybe confusing.

THE COURT: I'll tell you what. Before we do that, we'll take a ten-minute recess.

Q Mr. Marino, when we left off you were explaining what Exhibit G, as in George, (see Govt. Ex. 4), represents.

A Exhibit G is a fax stating that "found original receipt for the generator, Honda EU 3000."

Q Now, what are the circumstances of the particular piece of paper—you sent this to Prudential Insurance, correct?

A To Julia Moody, yes.

Q And before you sent the piece of paper, you were saying you couldn't find Iacona Equipment Company?

A Yes, right.

Q You couldn't find a copy of the original receipt?

A Yes.

Q Did you know somebody that had an identical generator?

A Yes.

Q Who was that?

A Bill Egan.

Q And how did he acquire a virtually identical unit?

A Well, I was doing the construction job at his house. We work hand-in-hand together.

He was out on the boat one day with his family. I had the generator, and he had asked of its quality of operation because he wanted one for his house. I had highly recommended that unit, and he went out and purchased the same one.

Q So knowing that he had purchased it—had purchased it when?

A A year after I got mine. He got it last summer.

Q And when he purchased it, you knew that he had a receipt, or at least you hoped he did; is that correct?

A   Yeah.

Q   And did he in fact have a receipt?

A   Yes, sir, he did.

Q   And was it the same type and model as you had purchased the year before?

A   Exactly the same.

Q   At the moment of ill-conceived inspiration, what did you do with the Bill Egan—

THE COURT: I want to hear that question.

BY MR. GRUNEWALD:

Q   At the moment of ill-conceived inspiration—

THE COURT: Ill-conceived inspiration.

MR GRUNEWALD: Yes, yes, yes.

BY MR. GRUNEWALD:

Q   —what did you do?

Did you make a copy of Bill Egan's receipt?

A   Yes.

Q   *And what did you do with this receipt?*

A   *In the right top where it had "Bill Egan" under "purchase's name," I whited it out and put in "Theresa Proscia" and our address.*

Q   *And how about the date?*

A   *The date was changed to 2000, when I had purchased my generator.*

Q   *So you made it—so Egan's receipt was June 25, 2001?*

A   *Yes.*

Q   *And you made it—*

A   *—2000.*

Q   *And did you do anything else with respect to—there was a receipt for the payment of the price?*

A   *The credit card receipt, the date was also changed from 2001 to 2000.*

Q   But you did not alter the signature?

A   No. Absolutely not. No.

Q   And those were the changes you made?

A   Yes.

Q   And why did you do this? It's obvious, but tell us why.

A   Well, after numerous conversations with Julia Moody and an exhaustive search to try to find Iacona Equipment or anybody connected to Iacona Equipment, I had informed her prior to this submission that a friend of mine has the same unit a year earlier—newer than mine, and if I could submit that receipt for reference, or for whatever reason.

And she said she'll take a look at it. "Send me what you have." So I did that.

I changed the information for purchaser from "Bill Egan" to "Theresa Proscia."

I never did an insurance claim before in my life, and I guess—there's no other explanation but I just was not thinking, I guess, what I was doing. But the thought process at the time was when it got to her desk, knowing how big insurance companies are, that if this thing said Bill Egan on it and somebody didn't know what it was, it would be thrown in the trash.

So I wanted a reference to Theresa Proscia, my grandmother, the insured. It was never submitted or told to anybody at any time that this was my receipt from my unit.

Q   But you represented it to be; isn't that correct, Mr. Marino?

A   Yes.

Q   *You did it because you felt that this would facilitate your claim; is that correct?*

A   *Yes.*

Q   *And did you understand that at the time you did it, it was wrong?*

A   *Oh, absolutely. Yes.*

Q   In fact, as events turned out, as I say in my own memorandum here, "sin-

gularly conspired stupidity on your part"?

A Yes.

Q *But you altered it?*

A. *Yes.*

Q *And you sent it in?*

A *Yes.*

Q But did you have that unit when it was—

A Yes, I had a unit that I purchased, the exact same unit in the year 2000, one year prior to this unit.

Q And that was a unit that was stolen on the night or the early hours, I guess, perhaps, of May 9, 2001.

Tr. at 175–80 (emphasis supplied).

In this regard, the Court discredits the testimony of Marino to the effect that Julia Moody in any way knew anything about this fraudulent maneuver, or that she told Marino to send in a receipt from an Egan purchase, or that she would accept such a receipt for a different generator.

Marino concluded his testimony on direct examination by stating that all the stolen items *were* in existence prior to May 9, 2001 and he used these items in his construction work. He stated that the bulk of these items were bought for a new business he started in 2000 called Cellular Industries, Inc. This business was incorporated for the purpose of constructing cell towers. Further, Marino stated that these items were in his shed on May 9, 2001 and, they were, in fact, stolen.

Theresa Proscia testified that her grandson lived with her for 10 years. Marino did the repairs in her home because he was very handy in tools and computers. Proscia saw her grandson using tools in her home. She gave him $15,000 in cash and other money "on and off" to buy tools. In addition, Proscia gave him $2,700 to $3,000 in cash to buy a generator, which he did. She stated that tools were kept in the shed. She really doesn't know what tools were in the shed. Also, interestingly, when there was an investigation by Prudential, Proscia wanted to drop the claim. She told investigator Lisi that "I could be very happy if we forgot the whole thing (and) cancel the claim." Proscia was worried that this Prudential problem would involve her homeowners and automobile policies.

Q And did you get a cancellation notice due to a claim of fraud by the Prudential?

A Yes, sir. I did.

Q And did you try to hide this from your grandson?

A Yes, I did.

Q And did he want to see the letter?

A He wanted to see it, but I had taken it to my daughter's house and I left it there.

Q And were you mad at your grandson because of this carrying on with the Prudential?

A Yes, I was. I had to protect my life, my insurance.

Q So you just wanted this whole business to go away, even if it cost you?

A Right.

Tr. at 252.

The final witness was Maureen Egan. Marino has been her boyfriend for 2½ years. She saw Marino using tools in her brother's house. He kept the tools in the shed and in her house. Egan described in detail the work that Marino did and the various tools he used in doing so.

In rebuttal, Probation Officer James testified that he did not give Marino permission to go to Pleasantville or to work there. Under the conditions of Marino's supervised release, he had to stay in the confines of the Eastern District of New York. Therefore, Marino violated the travel restrictions while on supervised release, when he repeatedly went to Pleasantville,

which is in Westchester County and outside the confines of the Eastern District.

### III. *DISCUSSION*

After his term of incarceration, Paul Marino was sentenced to a three-year supervised release term which commenced on April 13, 1999. In a violation of supervised release report dated February 11, 2002, the releasee is charged in having violated the following standard condition of supervision: "(The Offender) shall not commit another federal, State or local crime."

The report goes on to charge the releasee with committing mail fraud, in violation of 18 U.S.C. § 1341. Specifically, Marino is accused of mailing fraudulent documents to Prudential Property and Casualty Company, located in Richmond, Virginia, to perpetuate a fraudulent insurance claim.

■ As stated in 18 U.S.C. § 3583(e)(3), a Court may revoke a term of supervised release and impose a prison sentence if the Court finds, by a preponderance of the evidence, that the defendant violated a condition of supervised release. *See also United States v. Meeks*, 25 F.3d 1117, 1123 (2d Cir.1994) ("the government needs to prove the alleged supervised-release violation only by a preponderance of the evidence, not beyond a reasonable doubt").

■ The federal mail fraud statute provides that:

Whoever, having devised ... any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses ... for the purpose of executing such scheme ... places in any post office ... any matter or thing whatever to be sent or delivered by the Postal Service ... shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 1341. The essential elements of a mail fraud violation are (1) use of the mails to further (2) a scheme to defraud

with (3) money or property as the object of the scheme. *United States v. Dinome*, 86 F.3d 277, 283 (2d Cir.1996). Fraudulent intent is established when "some actual harm or injury was contemplated by the schemer.'" *Dinome*, 86 F.3d at 283 (quoting *United States v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir.1994)). An individual may be convicted under the federal mail fraud statute for "devis[ing] or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1341. The scheme need not have been successful.

■ As to the element of a scheme to defraud, the government is required to prove (i) the existence of a scheme to defraud, *see United States v. D'Amato*, 39 F.3d 1249, 1256–57 (2d Cir.1994), (ii) the requisite scienter (or fraudulent intent) on the part of the defendant, *see id.* at 1257, and (iii) the materiality of the misrepresentations, *see Neder v. United States*, 527 U.S. 1, 25, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999). The mail and wire fraud statutes do not define "scheme to defraud," but it has been described as a plan to deprive a person "of something of value by trick, deceit, chicane or overreaching." *McNally v. United States*, 483 U.S. 350, 358, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). It is characterized by a departure from community standards of "fair play and candid dealings." *United States v. Ragosta*, 970 F.2d 1085, 1090 (2d Cir.1992).

■ The Court finds that there was sufficient evidence to support the Government's charge that there was a scheme to defraud the Prudential Property and Casualty Co.

■ As to scienter, "essential to a scheme to defraud is fraudulent intent." *D'Amato*, 39 F.3d at 1257. It is not sufficient that [the] defendant realizes that the

scheme is fraudulent and that it has the capacity to cause harm to its victims. Instead, the proof must demonstrate that the defendant had a " 'conscious knowing intent to defraud ... [and] that the defendant contemplated or intended some harm to the property rights of the victim.' " *U.S. v. Guadagna*, 183 F.3d. 122, 129 (2nd Cir.1999) (citation omitted) (quoting *United States v. Leonard*, 61 F.3d 1181, 1187 (5th Cir.1995)); *see United States v. Gabriel*, 125 F.3d 89, 97 (2d Cir.1997).

The Court concludes that, viewing the totality of the evidence, the Government established scienter on the part of Marino to knowingly defraud the Prudential Property and Casualty Co.

█ In order to convict a defendant of mail fraud in violation of 18 U.S.C. § 1341, the government must show that the defendant engaged in a scheme to defraud [the] victim of money or property, and that the scheme was furthered by use of the mails. *United States v. Laljie*, 184 F.3d 180, 188 (2d cir.1999). To prove the "use of mails" element, the government need show only that a mailing that defendant implemented was "incident to an essential part of the scheme." *Id.* (citation and quotation omitted). *See also* U.S. v. *Naiman*, 211 F.3d 40 (2d Cir.2000).

In this proceeding, the Court finds that the government proved, by a preponderance of the evidence, that Marino used the mails incident to an essential part of the scheme; namely, to send altered, false and fraudulent documents to Prudential in order to obtain payments under the Proscia homeowner's policy.

In reaching these conclusions, the Court has reviewed the evidence, as above set forth and finds two separate violations of the mail fraud statute:

### (1) The Hilti, Inc. "Invoice" (Gov't Exh. 3)

The government proved, by a preponderance of the evidence, that the releasee concocted and prepared a false invoice in regard to the tool and bits set forth in the document. The document contained materially false statements. The date on the 10/21/00 invoice is erroneous because this type of form ceased to be in existence on July 5, 1995 and was no longer used after that date. In addition, the address in the invoice has not been used by Hilti since 1986 or 1987. Also, Michael Burke, the salesman named in the invoice, ceased being employed by Hilti on May 19, 1990, while the invoice date is October 21, 2000. Finally, in regard to this patently false document, the Court credits the testimony of the Hilti Manager that he reviewed the company records and that there was no recorded sale to a Proscia or a Marino going back to July 5, 1995.

The Court finds that the government proved, by a preponderance of the credible evidence, that the releasee intentionally and knowingly created this false document for the purpose of deceiving Prudential and obtaining money from that carrier. Also, the United States mail was used to further this scheme to defraud.

With regard to the Hilti "invoice," the Court does not credit the releasee's explanations for the creation and mailing of this false and fraudulent document.

### (2) The Shane Marine "Invoice" (Govt.Ex.2)

The Court finds that the government proved, by a preponderance of the evidence, that the invoice bearing the name "Shane's Marine", dated 8/27/00 covering a Si–Tex Field Depth Finder in the sum of $2,237.69 is not authentic. According to the testimony of the successor firm's store manager, who previously worked for Shane's Marine, on 8/27/00, Shane's Ma-

rine did not exist. Shane Marine was purchased by West Marine in 1994.

The Court finds that the government proved, by the preponderance of the credible evidence, that the releasee intentionally and knowingly created this false document for the purpose of deceiving Prudential and obtaining money from that carrier. Also, the United States mail was used to further this scheme to defraud.

### CONCLUSION

The Court finds that the government proved, by a preponderance of the evidence, that the releasee, Paul Marino, violated the conditions of his supervised release, by committing the crime of mail fraud, as set forth above, with regard to the preparation and mailing of the Hilti and Shane Marine documents. The releasee will now be sentenced.

**SO ORDERED.**