UNITED STATES of America, Appellee,

v.

**Kay WRIGHT and Leslie Wright, aka Leslie White, Les White, Defendants–Appellants.**

**Docket Nos. 98–1148, 98–1156.**

United States Court of Appeals, Second Circuit.

Submitted Nov. 3, 1998.

Decided Nov. 18, 1998.

Zachary W. Carter, United States Attorney for the Eastern District of New York, Brooklyn, New York (Peter A. Norling, Lisa Fleischman, Assistant United States Attorneys, Brooklyn, New York, on the brief), for Appellee.

Hurwitz Stampur & Roth, New York, New York (James Roth, New York, New York, on the brief), for Defendant–Appellant Kay Wright.

Philip Katowitz, New York, New York, for Defendant–Appellant Leslie Wright.

Before: KEARSE and POOLER, Circuit Judges, and POLLACK, District Judge *.

KEARSE, Circuit Judge:

Defendants Kay Wright ("Kay") and Leslie Wright ("Leslie") (collectively the "Wrights") appeal from judgments entered in the United States District Court for the Eastern District of New York following their pleas of guilty before Charles P. Sifton, *Chief Judge,* convicting them of embezzling moneys from an organization that received federal funds, in violation of 18 U.S.C. § 666, and evading income taxes, in violation of 26 U.S.C. § 7201. Kay was sentenced principally to 24 months' imprisonment, to be followed by a two-year term of supervised release, and was ordered to make restitution in the amount of $377,818.03. Leslie was sentenced principally to 37 months' imprisonment, also to be followed by a two-year term of supervised release, and was ordered to make restitution in the same amount. On appeal, Kay challenges her sentence, contending that the district court erred in enhancing her Sentencing Guidelines ("Guidelines") offense level for abusing a position of trust and for defrauding vulnerable victims. Finding no merit in her contentions, we affirm the judgment against her.

Leslie, whose appeal principally challenged the amount of loss calculated by the court for sentencing purposes, died before his appeal could be heard. For the reasons that follow, we vacate the judgment against Leslie and remand to the district court for dismissal of the indictment against him.

---

* Honorable Milton Pollack, of the United States District Court for the Southern District of New York, sitting by designation.

## I. BACKGROUND

For a number of years prior to 1993, the Wrights operated a facility called Community Living Alternative ("CLA"), a 10–bed residence for mentally retarded adults. CLA was funded in part by Medicaid moneys that were provided by the federal government and administered by the New York State Department of Health. Leslie was its executive director and was responsible for its day-to-day operations. From 1988 until late 1992, Kay, his wife, was the chairperson and sole member of CLA's board of directors.

During the period 1990–1992, the Wrights wrote numerous checks to "cash" on CLA bank accounts, deposited cash thus obtained in their personal joint bank account, and used the money for personal items such as credit-card payments and luxury cars. The Wrights abruptly closed the facility in 1992 following official investigations of complaints from a CLA staff member and the sister of one resident that the Wrights were abusing the residents, providing them inadequate food and care, and forcing them to live in squalor.

Indicted in 1996 on various charges, the Wrights pleaded guilty in 1997 to embezzling funds from an organization that received federal funds, in violation of 18 U.S.C. § 666, and evasion of income taxes, in violation of 26 U.S.C. § 7201. Following the preparation of a presentence report ("PSR") on each defendant, and the receipt of the Wrights' objections to the PSR calculations of loss and recommendations for certain offense-level enhancements, the district court conducted a *Fatico* hearing.

Based on the evidence presented at that hearing, the court concluded that offense-level enhancements pursuant to Guidelines § 3A1.1(b) and 3B1.3 were appropriate because the embezzlement offense involved vulnerable victims and the defendants' abuse of positions of trust (see Part II.B. below). The court found that the amounts embezzled totaled $249,692.21 and that the total tax loss on unreported income was $128,125.82. The court used these figures both in calculating defendants' offense levels and in ordering restitution in the total amount of $377,818.03. The court sentenced each defendant at the bottom of the applicable Guidelines range, imposing prison terms of 24 months on Kay and 37 months on Leslie, each term of imprisonment to be followed by a two-year period of supervised release.

With respect to monetary penalties to be imposed on Leslie, the court stated as follows:

I'm not going to impose a fine, because I find financially Mr. Wright, particularly given this period of incarceration will not be finally [*sic*] in a position to pay one. Since for one reason any earnings which he is able to make during the period of supervision following his release or any monies that he has at present should be first and foremost paid in restitution for the very substantial losses that he's caused. I'm going to enter a restitution order directing that restitution be made to the New York Health Department in the total amount of $249,692.21. With credit for amounts that have previously been recovered. And to the United States Government for the amount of the tax loss of $128,125.82. This obligation of restitution becomes effective immediately. But I am not going to require any payments to be made prior to the commencement of the period of supervision when it is hoped Mr. Wright will again be in a position to earn a living.

At that point I'm going to impose a restitution obligation in the amount of $200 a month, with the full amount of restitution becoming due immediately prior to the termination of supervision. At that point, if he lacks the financial resources to pay the restitution, that is something that the statute can take into account at that point. But if he has the financial means to make restitution it will become due and owing at that point.

(Sentencing Transcript, March 10, 1998 ("Tr."), 26–27.) The court imposed the same restitutionary obligations on Kay.

Judgments were entered accordingly, and these appeals followed.

## II. DISCUSSION

In his brief on appeal, Leslie argued that the district court erred in calculating the

amount of loss for sentencing purposes; however, he died before this appeal could be heard. Kay challenges two of the offense-level enhancements used in arriving at her sentence. For the reasons that follow, we vacate Leslie's conviction, in light of his death, and remand for dismissal of the indictment against him; we reject Kay's contentions.

### A. Leslie's Appeal

■■■■ Ordinarily, when a convicted defendant dies while his direct appeal as of right is pending, his death "abates not only the appeal but also all proceedings had in the prosecution from its inception." *Durham v. United States*, 401 U.S. 481, 483, 91 S.Ct. 858, 28 L.Ed.2d 200 (1971) (per curiam). Two considerations underlie this rule of abatement. First, "the interests of justice ordinarily require that [a defendant] not stand convicted without resolution of the merits of an appeal." *United States v. Pogue*, 19 F.3d 663, 665 (D.C.Cir.1994) (per curiam) (internal quotation marks omitted). Second, to the extent that the judgment of conviction orders incarceration or other sanctions that are designed to punish the defendant, that purpose can no longer be served. *See, e.g., United States v. Dudley*, 739 F.2d 175, 177 (4th Cir.1984) ("shuffling off the mortal coil completely forecloses punishment, incarceration, or rehabilitation, this side of the grave at any rate"). Accordingly, upon receiving notice of a defendant-appellant's death during the pendency of his direct appeal as of right, we normally vacate the judgment and remand to the district court with instructions to dismiss the indictment. *See, e.g., Durham v. United States*, 401 U.S. at 483, 91 S.Ct. 858 (noting the unanimity of the lower courts in adopting this course); *United States v. Mollica*, 849 F.2d 723, 726 (2d Cir.1988).

The second rationale for the rule of abatement focuses on sanctions that are punitive, not on sanctions such as restitution, which are designed to compensate the victims of crime. In *Mollica*, we left open the question of whether the abatement principle should be applied when the sentence includes an order of forfeiture or restitution, *see* 849 F.2d at 726, and we have not since then ruled on that issue. Other Circuits, when faced with such

a question, have expressed varying views, usually hinging on whether the order in question was viewed as punitive or compensatory. *See, e.g., United States v. Oberlin*, 718 F.2d 894, 896 (9th Cir.1983) (forfeiture order abated as "essentially penal" even though some aspects may have been compensatory); *United States v. Dudley*, 739 F.2d at 176–78 (no abatement of restitution order, which court found to be essentially compensatory); *United States v. Mmahat*, 106 F.3d 89, 93 (5th Cir.) (restitution order abates if its purpose was penal but not if its purpose was compensatory), *cert. denied,* — U.S. —, 118 S.Ct. 200, 139 L.Ed.2d 138 (1997); *United States v. Logal*, 106 F.3d 1547, 1551–52 (11th Cir.) (restitution order should always be abated), *cert. denied,* — U.S. —, 118 S.Ct. 376, 139 L.Ed.2d 292 (1997). *See also United States v. Cloud*, 921 F.2d 225, 226–27 (9th Cir.1990) (rejecting challenge of (live) defendant to portion of judgment specifying that restitutionary amounts unpaid at the time of his death would then become due and payable immediately).

In the present case, Leslie was ordered not only to serve a prison term but also to pay restitution to the New York State Department of Health and to the United States government. After learning of his death, we asked the parties to submit supplemental briefs on the issue of whether so much of the judgment as convicted him and ordered him to pay restitution remains enforceable despite his death. In response, the government argues that the conviction and indictment should abate in their entirety "aside from the order of restitution." (Government's supplemental letter brief dated November 2, 1998, at 1.) The government argues that restitution orders are designed to compensate those who have been victimized by the offense, and it contends that that goal can be achieved in coordination with abatement by "permitting restitution orders to stand even after the demise of the defendant and the vacatur of his conviction otherwise." (*Id.* at 3.)

The analytical underpinnings of such a proposed accommodation are not entirely clear to us, since there is no civil judgment against Leslie, and once the conviction is

vacated there would seem to be no foundation for the order of restitution. (See, e.g., id. at 6 ("The fact that restitution orders could be civilly enforced by the United States or the victim does not transform the criminal penalty into an action at common law.").) However, we conclude that in the circumstances of the present case, we need not determine whether an order of restitution should be abated as a general matter, for here, retention of the restitutionary order would be a futile act.

In sentencing Leslie, the district court, although stating that the obligation of restitution was to "become[ ] effective immediately," stated that there was to be no immediate payment. Rather, having noted that Leslie was financially unable to pay a fine, the court stated, "I am not going to require any payments to be made prior to the commencement of the period of supervision." (Tr. 27.) Accordingly, as set out in Part I above, the court set a schedule of payments in the amount of $200 a month, to begin after Leslie's completion of his prison term and upon the commencement of his term of supervised release.

Leslie having died prior to the completion of his prison term, however, his restitutionary payments will never come due. Nor has the government called to our attention any permissible way in which the court could now make those payments due immediately. An acceleration in the ordered payment obligation would constitute an increase in punishment, for the imposition of which a defendant would be entitled to be present, see, e.g., Bartone v. United States, 375 U.S. 52, 53, 84 S.Ct. 21, 11 L.Ed.2d 11 (1963) (per curiam); United States v. Agard, 77 F.3d 22, 24–25 (2d Cir.1996). Since (a) Leslie's payments are not now due, (b) his obligation cannot be accelerated, and (c) the time for him to commence making payments can never arrive, the retention of the restitution order would be an act of futility. We therefore conclude that the order of restitution should be abated.

We leave for another day such questions as whether an order that makes restitution payable immediately should generally survive the death of a defendant during the pendency of his direct appeal as of right, and whether the answer to that question should depend on whether the appeal challenges the conviction itself as well as the order of restitution. The judgment of conviction against Leslie in the present case is to be vacated in its entirety, and the indictment is to be dismissed.

This decision does not, of course, lessen the restitutionary obligation imposed on Kay.

### B. Kay's Challenges to Her Sentence

In calculating Kay's sentence, the district court increased her offense level by two steps pursuant to Guidelines § 3A1.1(b) because the offense involved vulnerable victims, and by two steps pursuant to § 3B1.3 because she abused a position of trust. Kay contends that these enhancements should not have been applied to her. We disagree.

 The 1992 version of the Guidelines, under which the Wrights were sentenced, required a two-step enhancement of offense level if the defendant "knew or should have known that a victim of the offense was unusually vulnerable due to age, physical or mental condition, or that a victim was otherwise particularly susceptible to the criminal conduct." Guidelines 3A1.1(b) (1992). Even where the principal economic effect of the offense is felt by a nonvulnerable entity such as the government, "an enhancement for vulnerable victims is appropriate where the exploitation of" vulnerable individuals "is part of the scam." United States v. Borst, 62 F.3d 43, 47 (2d Cir.1995) (internal quotation marks omitted). The enhancement is especially appropriate when, by reason of their vulnerability, victims are targeted by the defendant and made to be "unwitting instrumentalities" of a fraud. United States v. Echevarria, 33 F.3d 175, 180–81 (2d Cir. 1994).

Such an enhancement was particularly appropriate with respect to the embezzlement offense here. During the period in question, the Wrights operated their residential facility for persons who were mentally retarded, some profoundly so. Most of the residents were incapable of even leaving the facility unaided, and they were totally dependent on CLA staff for food and other necessities. The Wrights wrote checks for some 50 per-

cent of CLA's nonpayroll funds to "cash," most of which found its way into their personal joint bank account, while they deprived the residents, the intended beneficiaries of those moneys, of any semblance of adequate care. For example, the evidence at the *Fatico* hearing included testimony that the Wrights provided low quality food and made no accommodation for individual residents' special dietary needs. Few residents had toothbrushes, and none had supplies for cleaning dentures; inspectors found the dentures of one elderly resident in a container that was covered with mold. The CLA washer and dryer were often out of order, so that residents were not provided with clean clothing, towels, and bed linens. The facility was infested with vermin; inspectors found one resident in his bed with roaches crawling in his sheets and on his face. The residents themselves, mentally retarded and frightened into silence, did not complain; the whistle was blown by a staff member and a visitor. As the district court found,

> [w]hile the immediate first level victim here was a government agency, the secondary victims of the Wrights' embezzlements were the residents of CLA, who ... as a result of mental and physical disabilities were unusually vulnerable to a situation in which they were being deprived of what the money that the Wrights were diverting should have paid for. The testimony as to the pathetic and horrifying reactions of the individuals who were deprived of the very basics of living and the circumstances under which they were eventually brought to describe what had been done to them is sufficient to lead me with confidence to describe this offense as one in which vulnerable victims were targeted and deprived of what they were entitled to.

(Tr. 14.)

We are unpersuaded by Kay's contention that the vulnerable-victim enhancement should not have been imposed on her because Leslie was to blame for the scheme to exploit the CLA residents. There is no dispute that Kay cosigned the checks for the cash that found its way into the bank account she shared with Leslie. Further, Kay herself, not Leslie, wrote the checks on that account for their personal expenditures. Nor is

there merit in her contention that the enhancement was inapplicable because she was merely negligent and did not "target" the CLA residents. The enhancement is applicable to a defendant who "knew or should have known that a victim of the offense was unusually vulnerable." We see no basis on which the district court's determination that Kay was such a defendant could properly be overturned.

■ Nor do we find merit in Kay's challenge to the enhancement for abuse of a position of trust. Guidelines § 3B1.3 provides, to the extent pertinent here, that the offense level is to be increased by two steps if the defendant "abused a position of public or private trust ... in a manner that significantly facilitated the commission or concealment of the offense." The 1992 version of the commentary to this section provided that this enhancement was warranted if the position of trust "contributed in some substantial way to facilitating the crime and [has] not merely ... provided an opportunity that could as easily have been afforded to other persons." Guidelines § 3B1.3 Application Note 1 (1992).

■ Whether a position is one of "trust" within the meaning of § 3B1.3 is to be viewed from the perspective of the offense victims, *see, e.g., United States v. Booth,* 996 F.2d 1395, 1396 (2d Cir.1993) (per curiam); *United States v. Castagnet,* 936 F.2d 57, 62 (2d Cir.1991), and is a question of law for the court, subject to *de novo* review on appeal, *see, e.g., United States v. Jolly,* 102 F.3d 46, 48 (2d Cir.1996); *United States v. Broderson,* 67 F.3d 452, 455 (2d Cir.1995). One who merely engages in arms-length dealings in a commercial transaction does not thereby occupy a position of trust. For example, in connection with a fraud offense, a defendant who merely procures loans to his company does not hold a position of trust vis-à-vis the lenders. *See United States v. Jolly,* 102 F.3d at 48–50. Nor does a corporate officer who negotiates a procurement contract with the government thereby occupy a position of trust vis-à-vis the government. *See United States v. Broderson,* 67 F.3d at 455. On the other hand, a defendant who is a fiduciary or one who is responsible for the well-being of a

victim of his crime, and as such is given discretion over spending and is thereby afforded an opportunity, not generally available, to embezzle moneys, does occupy such a position. *See, e.g., United States v. Valenti,* 60 F.3d 941, 947 (2d Cir.1995) (enhancement proper as to defendant who embezzled funds from private apartment owners' association of which he was treasurer); Guidelines § 3B1.3 Application Note 1 (enhancement applies in case of embezzlement by attorney serving as victim's guardian).

 The abuse-of-trust enhancement was appropriate in the present case. Public funds were entrusted to CLA, to be used for the benefit of its mentally retarded residents. The Wrights were able, without fear of timely detection by either the government, who entrusted them with the funds, or the mentally retarded residents whom the funds were intended to benefit, to spend substantial portions of those funds for their own personal purposes. Kay's reprise of her contention that Leslie orchestrated the embezzlement scheme and only he was to blame is unpersuasive. It is possible for a defendant to abuse a position of trust whether or not she is a leader of the operation. *See* Guidelines § 3B1.3 (enhancement "based upon an abuse of a position of trust ... may be employed in addition to an adjustment under § 3B1.1 (Aggravating Role)"). Here, Kay was chairperson of CLA; she was its sole director; she had check-signing power; no one held a higher position at CLA. She enjoyed unsupervised discretion over the disbursement of CLA funds. She had a duty to exercise that discretion for the benefit of CLA's residents and to put public funds to their intended use. Instead, she signed 1,077 CLA checks made out to cash and used most of the proceeds for lavish personal expenditures. Whether viewed from the standpoint of the governmental agencies that entrusted the funds to CLA's management to use them properly for the well-being of the intended beneficiaries, or from the standpoint of the mentally retarded residents who depended on the Wrights for their care, we think it plain that the Wrights occupied positions of trust within the meaning of § 3B1.3.

## CONCLUSION

We have considered all of Kay Wright's arguments on her appeal and have found them to be without merit. The judgment as to Kay Wright is affirmed.

We have considered all of the government's arguments in support of the survival of the order of restitution entered against Leslie Wright and have found them unpersuasive in the circumstances of this case. For the reasons discussed above, the judgment against Leslie Wright is vacated, and the matter is remanded for dismissal of the indictment against him because of his death during the pendency of his appeal.